513 A.2d 893

## AD + SOIL, INC.

v.

## COUNTY COMMISSIONERS OF QUEEN ANNE'S COUNTY

No. 143, Sept. Term, 1985.

Court of Appeals of Maryland.

Aug. 26, 1986.

Jeffrey A. Dunn (Benjamin R. Civiletti, James A. Dunbar and Venable, Baetjer & Howard, on the brief), Baltimore, for appellant.

Roger D. Redden (Paul A. Tiburzi and G. Richard Dent, on the brief, Baltimore, and Patrick E. Thompson, Co. Atty., on the brief, Centreville), for appellee.

Argued before MURPHY, C.J., and SMITH,* EL-DRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

MURPHY, Chief Judge.

Since 1974, the General Assembly has required that any person intending to engage in the "collection, handling, burning, storage, or transportation of sewage sludge" obtain a permit from the State Department of Health and Mental Hygiene. *See* chapter 680 of the Acts of 1974.[1]

---

\* Smith, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Until 1984, this requirement was codified at Maryland Code (1982), § 9–210(b) of the Health-Environmental Article. By chapters 748 and 779 of the Acts of 1984, § 9–210(b) was repealed and the permit

Involved in this case is a sewage sludge storage and distribution facility located in Queen Anne's County. The principal issue is whether, in light of the public general laws of the state governing sewage sludge management and utilization, the county may exercise its local zoning power to regulate the operation of such a facility which has previously obtained the requisite state permits from the Department.

## I.

Ad + Soil, Inc. (Ad + Soil) is a Pennsylvania corporation engaged in the business of disposing of processed sewage sludge. Its first sludge disposal contract, beginning in June of 1982, was with the Washington Suburban Sanitary Commission; it expired in March of 1985. Since October 1984, the company has contracted with the District of Columbia to dispose of at least 200 tons of sludge per day from the Blue Plains Wastewater Treatment Plant. Ad+Soil's primary responsibility under the contract is to transport the sludge in sealed trucks to Maryland's Eastern Shore, where it applies the sludge free of charge to the fields of cooperating farmers for use as a fertilizer and soil conditioner.

Under certain weather conditions, such as heavy rain or sub-freezing temperatures, the sludge cannot be applied to the fields. Ad + Soil's contract with the District therefore requires that it maintain the capacity to store 18,000 tons of sludge, this being the amount which it is obligated to remove from Blue Plains over a 90–day period.

In 1982, Ad + Soil obtained a site in Queen Anne's County from which it began distributing sludge to cooperating farms. The site was zoned A–1 Agricultural under the county's Zoning Ordinance. Although the record is not entirely clear, it appears that Ad + Soil did obtain the

provision was recodified, along with additional legislation regulating the utilization of sewage sludge, as § 9–210.1.

necessary permit from the Department of Health and Mental Hygiene, as then required by Code (1982), § 9–210(b) of the Health-Environmental Article, to operate a sludge transfer station at this site.[2]

By letter dated December 21, 1982, the County Zoning Administrator notified Ad + Soil that its sludge transfer station violated the applicable provisions of the Queen Anne's County Zoning Ordinance.[3] In response to Ad + Soil's request for a clarification, the Zoning Administrator in a letter dated December 28, 1982 explained that "to receive, mix, and then distribute sludge from [Ad + Soil's site] to off-premise locations is not a permitted use in the 'A–1' Agricultural District. It is my opinion that this would be a distributing establishment which is first permitted in the 'B–2' General Business District." [4]

In early 1983, Ad + Soil leased a new site in the county comprising approximately ten acres near Queenstown. The site was located in an M–2 General Industrial District, and was part of an existing gravel quarry owned by R.B. Baker & Sons, Inc. Under § 16.101 of the Zoning Ordinance, any use or structure permitted in a B–2 district is also permitted in an M–2 district, subject to certain modifications and exceptions. Ad + Soil selected the new site as the location for both its transfer operation and the construction of a

**2.** Unless otherwise indicated, all statutory provisions cited in this opinion are within the Health-Environmental Article.

**3.** Queen Anne's County's enabling authority in land use planning and zoning is derived from Maryland Code (1983 Repl.Vol.), Art. 66B, § 4.01 which empowers it, among other matters, "to regulate and restrict ... the location and use of ... structures and land for trade, industry, residence or other purposes"; and to "impose such additional restrictions, conditions, or limitations as may be deemed appropriate to ... protect the general character ... of the surrounding or adjacent lands."

**4.** The Zoning Ordinance did not specifically enumerate sewage sludge transfer stations; however, § 14.110 of the Ordinance listed as a principal permitted use in a B–2 district: "Wholesale business, warehousing, storage and distributing establishments,—except for flammable liquids or explosives."

sludge storage facility. By letter dated June 23, 1983, the Zoning Administrator advised Ad + Soil that a zoning permit and a release from an existing conditional use decision affecting the site would be required before operations could begin.[5]

On June 24, 1983, Ad + Soil obtained a state permit from the Department of Health and Mental Hygiene authorizing it to transport sludge to its Queen Anne's County facility, store up to approximately 2,100 tons at the site, and transfer the sludge to cooperating farms. Ad + Soil began such operations immediately upon obtaining the state permit. It did not, however, apply for zoning approval from the county authorities.

By letter dated August 23, 1983, the Zoning Administrator notified Baker that because the use of the site had been changed and improvements added without zoning approval, he was to cease all activities at the site until the requisite zoning permits were obtained, together with a release from the existing conditional use decision.

On September 13, 1983, Baker and Ad + Soil applied for a zoning certificate and a building permit for the facility which remained in full operation. The following day, Baker, as owner of the site, filed an application with the County Board of Appeals for the release of the existing conditional use. The applicants were informed that consideration of their application for the zoning certificate and building permit would be delayed until the Board had acted on the application for a release from its earlier conditional use decision.

On October 26, 1983, the Board granted Baker's application for release of the conditional use of the property. By letter dated November 2, 1983, however, the Zoning Administrator notified Baker and Ad + Soil that the County Com-

---

5. The existing conditional use authorized the operation of a sand and gravel quarry on the Baker property, and required that the topsoil be replaced and the land restored as either farmland or forest following cessation of the excavation activities.

missioners had adopted amendments to the Zoning Ordinance on October 25, 1983 which expressly made the storage and distribution of sewage sludge a conditional use in A–1, A–2, and M–2 districts.[6] The letter indicated that the application for a zoning certificate and building permit would not be granted until the requisite conditional use permit was obtained from the Board; Baker and Ad + Soil were directed to apply for the necessary zoning authorization or cease all activities at the site within fifteen days.

---

6. The October 25 amendments added the following language to § 16.202, which lists conditional uses in an M–2 district:
   "Storage and Distribution of Sewage Sludge provided that:
   a) the storage lagoons or ponds shall be constructed of compacted soils that meet the specifications of the Soil Conservation Service for animal waste storage lagoons, and said plans and specifications shall be approved by the Soil Conservation Service; b) there be an approved Sediment Control Plan; c) a minimum freeboard of two (2) feet be maintained at all times; d) the storage facility shall be located in a relatively level area; e) the storage location shall be located a minimum of one hundred (100) feet from any property line, two hundred (200) feet from any road, one hundred fifty (150) feet from any drainage ditch, swale or gully, and a minimum of three hundred (300) feet from any stream, lake, pond or other body of water; f) facilities be provided for the washing off and cleaning of vehicles before they leave the site to assure that no sludge, mud or dirt will be brought onto public roads; g) the entrance to the site shall be approved by the County or State Highway Department whichever is applicable; h) that applicant has obtained all permits from the Department of Health and Mental Hygiene. The Board shall obtain an adequate bond or other satisfactory guarantee to insure compliance with these requirements and any other requirements the Board may impose in accordance with Section 20.44. The Board shall also give specific consideration to the limitations, guides and standards as outlined in Section 20.5. The Board may increase the above required setbacks, depending on site condition, and to assure that the applicant will meet all Federal, State and Local requirements."
   The parties disagree as to whether sludge storage and distribution constituted a conditional use before the October 25 amendments were adopted. The county maintains, and the circuit court concluded, that, because these activities were not specifically listed anywhere in the Zoning Ordinance, they were within the scope of § 16.202, which lists as a conditional use in an M–2 district: "Any other use which in the opinion of the Board of Appeals is of a similar character to those specified above." Ad+Soil argues that its transfer station and storage facility together constitute a "distributing establishment," a permitted use in both M–2 and B–2 districts.

Neither Baker nor Ad + Soil applied for the requisite zoning approvals within the allotted time; nevertheless, operations at the site continued and indeed intensified. On December 28, 1983, Ad + Soil obtained a state permit authorizing it to operate, in accordance with its construction and site plan previously approved by the Department, a large, newly constructed sludge storage facility at the same location. The storage facility, characterized by Ad + Soil's president as a "manure lagoon," consisted essentially of a shallow, man-made pit surrounded by an earthen dike, containing a surface area of approximately 90,000 square feet, and the capacity to store approximately 36,000 tons of sludge. Ad + Soil began storing sludge within this structure the day after it obtained the state permit, without applying for any form of zoning approval from the county authorities.

During December, Ad + Soil sued the county in the United States District Court for the District of Maryland, seeking injunctive and declaratory relief. In its complaint, Ad + Soil challenged the October, 1983 amendments to the Zoning Ordinance on several grounds, including pre-emption by and irreconcilable conflict with state law. In June, 1984, the federal court granted the county's motion to dismiss on the basis of abstention, concluding that the case presented unsettled questions of state law which were best resolved in a state court. *See Ad + Soil Serv. v. Bd. of Cty. Com'rs of Queen Anne's*, 596 F.Supp. 1139 (D.Md.1984).

On August 9, 1984, Baker and Ad + Soil filed applications with the Board of Appeals for the conditional use permit required by § 16.202 of the amended Zoning Ordinance, and for four variances from its setback, freeboard, and bonding requirements. The matter was docketed as Case CU–56, and a hearing was conducted on October 4, 1984. On October 25, the Board unanimously denied the applications. It first explained that, under the Zoning Ordinance, it was authorized to grant variances only in response to extraordinary conditions unique to the property involved that would make literal compliance with the Ordinance exceptionally

difficult, and then only when the granting of the variance would not be substantially detrimental to adjacent property or contrary to the purpose of the Ordinance. The Board concluded that Baker and Ad + Soil had failed to produce any evidence of these requisites.

Because the variances were necessary to satisfy the requirements for the conditional use permit, the permit was also denied. The Board noted, however, that the Ordinance required it to consider in all conditional use cases such factors as the probable effect of the use on property values and the peaceful enjoyment of people in their homes, and the probable effects of any odors on the surrounding property. The Board also noted that the Ordinance required denial of permits if the use would adversely affect the public health, safety, security, morals, or welfare, or would jeopardize the lives or property of people living in the neighborhood. Because of undisputed evidence regarding the emanation of odors from Ad + Soil's facilities, and what it viewed as unresolved questions as to the facilities' impact on the local environment, the Board indicated that had it considered the merits of the conditional use application it would have denied the permit on that ground as well. The Board further determined that the county zoning ordinance had not been pre-empted by the provisions of state law governing the operation of sewage sludge facilities.

In November 1984, Ad + Soil filed a timely appeal to the Circuit Court for Queen Anne's County from the Board's order in Case CU–56, contending that it was arbitrary and capricious and that the county's zoning ordinance governing sewage sludge facilities was pre-empted by and in conflict with state law on the subject. Ad + Soil also filed an action for a declaratory judgment in the same court, seeking a determination that the October 1983 amendments were illegal on pre-emption and conflict grounds; the suit included a prayer for damages against the county for alleged violations of Ad + Soil's right to due process. Shortly thereafter, the parties agreed to stay both of these

proceedings to allow Ad + Soil and Baker to submit another zoning application for the Board's consideration.

The new zoning application was docketed as Case CU–61, and additional hearings were conducted on May 2, 1985. On May 16, the Board again unanimously denied the application. It reiterated the criteria set forth in the Zoning Ordinance governing the issuance of variances, and observed that the applicants had again failed to adduce any evidence that these criteria were satisfied in this case. On the basis of the record before it, the Board concluded

"that the sludge storage facilities being applied for could easily be located on that property so as to comply with all of the setback requirements of the Queen Anne's County Zoning Ordinance. The only extraordinary circumstances which would seem to exist in this case are self inflicted and a result of [Ad + Soil's] construction of the facilities on the site without conforming to the Ordinance's required setbacks."

The Board also found "overwhelming evidence" that Ad + Soil's operations generated a "grossly offensive" odor "which has persisted on at least a frequent basis throughout the term of the pit's operation." The Board again concluded that the sludge transfer and storage facilities denied local residents the peaceful enjoyment of their homes, and substantially diminished the value of surrounding properties. It discounted Ad + Soil's testimony that the company had identified and eliminated the source of the odor, noting that it had given the same assurances at the October 4, 1984 hearing but that the problem continued unabated. Ad + Soil thereafter appealed from the Board's order denying its application in CU–61.

On June 7, 1985, the Zoning Administrator ordered Baker and Ad + Soil to cease and desist from all activities at the site. Thereafter, Ad + Soil sought and obtained an *ex parte* injunction in its declaratory judgment case allowing it temporarily to continue in operation. In July, a fourth action involving Ad + Soil and Queen Anne's County was

filed in the circuit court, this time by the county seeking enforcement of its June 7 cease and desist order.

Ad + Soil subsequently filed a motion for an interlocutory injunction in its declaratory judgment action upon which the circuit court (Rollins, J.) conducted extensive evidentiary hearings and heard oral argument on the pre-emption and conflict issues there raised.  On August 28, the county filed a motion in Ad + Soil's administrative appeal from the Board's order in Case CU–61, requesting that the circuit court expeditiously issue final judgment in that case before ruling on Ad + Soil's motion for an interlocutory injunction in the declaratory judgment action.  The county suggested that the court could thereby resolve the issues of pre-emption and conflict common to all three of Ad + Soil's pending cases and thus provide an avenue for appellate review of these issues that could render the remaining actions moot.

Acting on the county's motion on December 2, 1985, the court (Rollins, J.) affirmed the Board's orders in both administrative appeals.  It first considered the pre-emption issue, and concluded that the state's regulatory scheme neither expressly nor impliedly pre-empted the county's traditional zoning authority.  It also found no direct conflict between the Zoning Ordinance and the state statute governing sludge utilization, noting that the state law did not address such issues as setbacks or site location.  The court further concluded that the county's denial of Ad + Soil's applications did not amount to an effective prohibition of activity authorized by the state law, observing that "the County has merely decided that the Baker property is not an appropriate site for a permanent sludge storage facility such as Ad + Soil's."  The court found no evidence of exceptional circumstances as would authorize the issuance of variances under the Ordinance.  It thus upheld the Board's denial of Ad + Soil's applications for variances, agreeing with the Board that the only hardships facing Ad + Soil were of its own making.  In addition, the court found substantial evidence in the record that the odor

produced by Ad + Soil's operations adversely affected the surrounding properties and the local residents' peaceful enjoyment of their homes. In affirming the Board's orders, the court held that the denial of Ad + Soil's conditional use permit was neither arbitrary nor capricious. In response to a motion for clarification, the court indicated that in reaching its decision it had not considered the evidence adduced at the August 8 hearing on Ad + Soil's motion in the declaratory judgment action for an interlocutory injunction, but had considered the legal arguments advanced by counsel in that case.

From the judgments of the circuit court in Cases CU 56 and 61, Ad + Soil appealed to the Court of Special Appeals.[7] We granted certiorari before the intermediate appellate court's consideration of the appeals to consider the significant issues presented in the case.

## II.

■ Ad+Soil first mounts a procedural challenge to the validity of the circuit court's judgments. It maintains that Maryland's constitutional and statutory law requires that a circuit court in an administrative appeal from an order of a county board of appeals conduct a hearing before issuing final judgment. Specifically, Ad+Soil asserts that the circuit court denied its statutory right under Code (1957, 1983 Repl.Vol.), Article 66B, § 4.08(b), and its constitutional right to due process secured by Article 24 of the Maryland Declaration of Rights, by failing to conduct a hearing on whether the Board of Appeals' orders were arbitrary and capricious and unsupported by the record.

Article 24 of the Declaration of Rights proclaims "That no man ought to be ... deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." As we have frequently indicated, Article 24

---

7. Pending determination of the merits of Ad+Soil's appeals, Judge Rollins issued an interlocutory injunction prohibiting the county from terminating Ad+Soil's operations.

embodies essentially the same concept of due process of law as does the Fourteenth Amendment to the federal constitution. *See, e.g., Webster v. State,* 299 Md. 581, 599 n. 9, 474 A.2d 1305 (1984); *Loveday v. State,* 296 Md. 226, 241, 462 A.2d 58 (1983); *Comm'n on Med. Discipline v. Stillman,* 291 Md. 390, 414 n. 9, 435 A.2d 747 (1981).

■ In the context of judicial proceedings, due process unquestionably requires that the parties be afforded an opportunity to be heard. *See Boddie v. Connecticut,* 401 U.S. 371, 377–79, 91 S.Ct. 780, 785–786, 28 L.Ed.2d 113 (1971); *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). At the appellate level, however, the constitutional right to be heard is satisfied where the parties are provided an opportunity to present their arguments to the court through the submission of written briefs, without oral argument. As we said in *Chevy Chase Village v. Board,* 249 Md. 334, 346, 239 A.2d 740 (1968), "[a] hearing in an appellate court is an argument-type hearing and appellate courts ... can decide and often have decided important cases and issues on printed arguments without oral presentation." The cases are generally in accord. *See Groendyke Transport, Inc. v. Davis,* 406 F.2d 1158, 1162 (5th Cir.), *cert. denied,* 394 U.S. 1012, 89 S.Ct. 1628, 23 L.Ed.2d 39 (1969); *Moore v. Spangler,* 401 Mich. 360, 258 N.W.2d 34, 37–38 (1977); *Byrd v. Columbia Falls Lions Club,* 183 Mont. 330, 599 P.2d 366, 367–68 (1979); *State ex rel. Reed v. Schwab,* 287 Or. 411, 600 P.2d 387, 390 (1979), *cert. denied,* 444 U.S. 1088, 100 S.Ct. 1051, 62 L.Ed.2d 776 (1980). This principle is, we think, clearly applicable to a circuit court's on the record review of the decision of a county board of appeals in a zoning action.

Ad+Soil was provided with ample opportunity to present its arguments to the court regarding the allegedly arbitrary and capricious nature of the Board's decisions. Indeed, in its initial legal memorandum filed in the circuit court in Case CU–61, Ad+Soil" presented a lengthy argument which it captioned "The Zoning Ordinance and the Board's

Decision Thereunder are Patently Arbitrary and Capricious." Ad+Soil further developed this argument in a reply memorandum filed in response to the county's brief. In these circumstances, the circuit court's decision to issue its judgment without hearing oral argument from Ad+Soil did not violate the company's right to due process under Article 24 of the Declaration of Rights.

Nor is there merit in Ad+Soil's argument that Article 66B, § 4.08(b) of the Code affirmatively required the circuit court to conduct a hearing before issuing final judgment. That section provides that

"[i]f, *upon the hearing*, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made." (Emphasis added.)

The "hearing" contemplated by § 4.08(b) is one which permits, but does not require, the circuit court to take additional evidence, if warranted in the court's discretion. Nothing in this section, as we read it, compels the court to hold a hearing if it determines to decide the case in its appellate capacity on the basis of the written briefs, without oral argument.

Relying primarily upon *Aspen Hill Venture v. Mont. Co.,* 265 Md. 303, 289 A.2d 303 (1972), Ad+Soil asserts that in any event the circuit court abused its discretion under § 4.08(b) by not conducting an evidentiary hearing on the issue of whether the Board acted arbitrarily and capriciously. In its brief, Ad+Soil proffers certain facts which it alleges constitute *"prima facie* evidence of the Board's participation in a multiple-step conspiracy to prevent Ad+Soil from operating in the County." It maintains that it was denied an opportunity to prove these facts by evidence adduced in the circuit court. In our view, *Aspen Hill*

is inapposite on its facts and we conclude, in the circumstances of this case, that Ad+Soil's allegations are without merit.

█ Of course, a circuit court's review of an administrative agency decision is ordinarily restricted to evidence in the record developed before the agency. *See, e.g., County Council v. District Land,* 274 Md. 691, 705–06, 337 A.2d 712 (1975); *Pattey v. Board of Co. Comm'rs,* 271 Md. 352, 359–60, 317 A.2d 142 (1974); *cf. Consumer Protection v. Consumer Pub.,* 304 Md. 731, 749, 501 A.2d 48 (1985); *Cicala v. Disability Review Bd.,* 288 Md. 254, 260, 418 A.2d 205 (1980); *Port Wardens v. Md. Cap. Yacht Club,* 261 Md. 48, 60, 273 A.2d 102 (1971). In *Aspen Hill,* however, we indicated that under certain narrowly prescribed circumstances the circuit court should consider evidence not contained in the administrative record. That case involved a local zoning body's denial of an application for rezoning. In the circuit court, the appellant attempted to prove the arbitrary and capricious nature of the zoning body's decision by proffering evidence that, shortly after denying the appellant's application, the same zoning body had approved similar applications regarding tracts adjacent to the appellant's. The circuit court declined to consider this evidence, holding that because it was not contained in the record it was outside the scope of judicial review. 265 Md. at 316–17, 289 A.2d 303.

In reversing the circuit court, we emphasized that evidence of subsequent inconsistent decisions of the same zoning body was highly reliable and probative, observing that they were "matters of public record which directly relate to the arbitrary, capricious or discriminatory quality of the conduct of the zoning authority which affects the property of the applicant." *Id.* at 317, 289 A.2d 303. We concluded that such evidence was admissible before the reviewing court as an exception to the general rule restricting judicial review to evidence in the administrative record.

We have previously indicated that *Aspen Hill* is not to be read as a general endorsement of inquiry into the motives

or thought processes of a zoning body. Thus, in *District Land, supra,* 274 Md. at 706, 337 A.2d 712, we stated that "[t]he language in *Aspen Hill* must be considered against its facts," and we there held that the circuit court had erred in admitting the depositions and correspondence of state officials as evidence that the zoning body's down-zoning of a certain tract was part of a scheme to depress the tract's value. *Cf. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *Public Service Comm'n v. Patuxent Valley,* 300 Md. 200, 209, 477 A.2d 759 (1984).

Specifically, Ad+Soil contends that had it been afforded an evidentiary hearing, it would have presented evidence that the timing of the Board's decision granting Baker's release from the then existing conditional use was the result of a "conscious conspiracy" to prevent Ad+Soil from operating. Ad+Soil suggests that the Board of Appeals, in an attempt to interpose a "new procedural barrier" to the company's zoning approval, deliberately delayed the announcement of its decision until after the County Commissioners had amended the Zoning Ordinance in October 1983.

Initially, we note that the chronology of events relevant to Ad+Soil's contention is well documented in the administrative record before the circuit court. The chronology was reiterated by Ad+Soil's president in an affidavit appended to Ad+Soil's initial memorandum filed in the administrative appeals. These averments, therefore, which served as the basis for the allegations of discrimination advanced by Ad+Soil in the memorandum submitted in its administrative appeals, and at the August 22, 1985 hearing in the declaratory judgment action, were before Judge Rollins in the circuit court when the court reached its decision in this case.

Furthermore, the absence of a formal evidentiary hearing did not preclude Ad+Soil from proffering additional evidence to the court, subject to the strictures of *Aspen Hill* and *District Land.* In *Aspen Hill,* the evidence of subse-

quent inconsistent decisions of the zoning body was submitted, not at a hearing, but as an appendix to the appellant's pleadings. Indeed, as already noted, Ad+Soil did proffer additional evidence in the form of an affidavit in precisely this manner. In its motion for an expedited judgment in these cases, the county proposed that the court issue its decision without conducting an evidentiary hearing. Ad+Soil received a copy of this motion three months before the decision was ultimately filed, and was therefore well aware that a final judgment might be imminent and that a hearing might not be held. Had Ad+Soil wished to proffer additional evidence outside the context of a hearing, it had ample opportunity to do so.

Finally, the relevant issue before the circuit court in Ad+Soil's administrative appeals was whether the Board had acted arbitrarily or capriciously in reaching its decisions *in those cases,* not in the case involving Baker's application for a release from the conditional use. Thus, even if Ad+Soil could have demonstrated that the Board had acted with a discriminatory purpose in delaying the announcement of its decision regarding Baker's release, such evidence would have been marginally probative at best in Ad+Soil's administrative appeals—far less probative than the evidence we held admissible in *Aspen Hill.*[8] We conclude that the circuit court did not abuse its discretion in declining to conduct an evidentiary hearing in these appeals.

### III.

In its administrative appeals to the circuit court, Ad+Soil challenged the Board's decisions in Cases CU–56 and CU–61

---

8. Ad+Soil also alleges that, had it been afforded a hearing, it could have proved that the Zoning Administrator acted with improper motives in requiring Ad+Soil to apply for building permits and in refusing to issue the permits until Baker obtained a release from the terms of the existing conditional use decision. The short answer to these allegations is that they are entirely irrelevant to the issue of whether the Board itself acted arbitrarily or capriciously. *Cf. Boehm v. Anne Arundel County,* 54 Md.App. 497, 511, 459 A.2d 590, *cert. denied,* 297 Md. 108 (1983).

on three grounds: that the entire field of sewage sludge utilization had been impliedly pre-empted by the state legislature's enactment of public general laws on the subject, thereby precluding any local regulation of Ad+Soil's facility; that the county's Zoning Ordinance conflicted with and was superseded by state law; and that the Board's decisions in these cases were arbitrary and capricious and unsupported by the record. We think the circuit court was correct in its determination that these arguments were lacking in merit.

## A. Pre-emption

The doctrine of pre-emption is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field. Pre-emption may be accomplished either expressly by statutory language prohibiting local legislation, *e.g., Montgomery County v. Atlantic Guns, Inc.,* 302 Md. 540, 489 A.2d 1114 (1985), or impliedly, by other unequivocal conduct of the General Assembly, *e.g., McCarthy v. Bd. of Education of A.A. Co.,* 280 Md. 634, 374 A.2d 1135 (1977); *County Council v. Montgomery Ass'n,* 274 Md. 52, 325 A.2d 112 (1975). In either case, the focus of the inquiry must be on whether the General Assembly has manifested a purpose to occupy exclusively a particular field. *See generally* 2 A. Rathkopf & D. Rathkopf, *The Law of Zoning and Planning* § 31.03, .04 (1986); 4 C. Antieau, *Local Government Law* § 31.09 (1986).

Ad+Soil readily concedes that the General Assembly has not expressly pre-empted the field of sludge utilization. Neither the statute in existence when Ad+Soil obtained its state permits, § 9–210, nor the current statute governing sludge utilization, § 9–210.1, contains any language prohibiting local legislation. Ad+Soil maintains, however, that these statutes constitute such a comprehensive regulatory scheme as clearly to imply a legislative purpose to occupy

the field and preclude all local regulation of sludge utilization facilities.

In recent years, we have considered implied pre-emption in a variety of contexts. In *National Asphalt v. Prince Geo's Co.,* 292 Md. 75, 437 A.2d 651 (1981), we found no legislative purpose to occupy exclusively the field of employment discrimination law, and therefore upheld against a challenge of implied pre-emption county ordinances prohibiting such discrimination. In so concluding, we noted that state legislation in this field was not comprehensive, since it failed to cover certain businesses and certain categories of employees, and that the state statutes did not mention pre-existing local law in the field, of which the state legislature was presumed to be aware. 292 Md. at 79, 437 A.2d 651.

Similarly, in *Annapolis v. Annap. Waterfront Co.,* 284 Md. 383, 396 A.2d 1080 (1979), we upheld a provision in a city charter that permitted the port wardens to consider environmental factors in issuing licenses for the construction of wharves, even though such factors were not enumerated in the state statute authorizing municipal regulation of harbors. We again emphasized the lack of comprehensiveness of the applicable state law and the failure of the state enactment to specifically address the pre-existing local law. 284 Md. at 392–93, 396 A.2d 1080.

Implied pre-emption was successfully invoked in *McCarthy, supra,* to invalidate two county ordinances providing for public transportation of children attending private schools. In an exhaustive opinion for the Court by Judge Smith, we traced the state's traditional stewardship of the field of education from early colonial times, and detailed the current state law's comprehensive regulation of all public aspects of education, including the publicly funded transportation of school children. We concluded that the long tradition of public control and the thoroughness of the state's regulation evidenced a legislative purpose to pre-empt the field, despite the absence of an express statutory

declaration to that effect. County ordinances purporting to regulate real property tax assessments were similarly invalidated in *Mont. Co. Bd. of Realtors v. Mont. Co.*, 287 Md. 101, 107–10, 411 A.2d 97 (1980), in view of the state's comprehensive and elaborately detailed legislation in this field.

The local ordinances involved in *Montgomery Ass'n, supra*, purported to regulate the campaign finance practices of candidates for the political offices of county executive and county councilman in Montgomery County. In holding the ordinances invalid on the basis of implied pre-emption, Judge Eldridge for the Court surveyed Maryland's constitutional and statutory law governing elections, and found "pervasive state administrative control of the election process, on both the statewide and local levels." 274 Md. at 62, 325 A.2d 112. We observed that this body of state law "contains detailed provisions covering every aspect of the electoral process," and that "[i]n the specific area of election practices dealt with by the county ordinances, namely the regulation of campaign finance and spending, the General Assembly has enacted extensive legislation." *Id.* at 61, 63, 325 A.2d 112. We further noted that, if the county ordinances were upheld, a dual system of regulating election finances would exist in the county "which would inevitably lead to utter confusion." *Id.* at 64, 325 A.2d 112. In light of the comprehensiveness of the state legislation, and the unreasonable consequences that would ensue from concurrent regulation, we concluded that "the purpose of the General Assembly [was] to occupy the field of election finances." *Id.*

Although the General Assembly has enacted extensive statewide legislation in the field of sewage management, the legislation manifests a general policy of fostering local control under state supervision, rather than to totally prohibit the enactment of laws on the subject at the local level. Title 9 of the Health Environmental Article, which contains the bulk of the state law governing sewage management, is replete with references to the concurrent legislative authori-

ty of local jurisdictions. Each county is required to adopt a comprehensive plan for sewage management, to be submitted for the review and approval of the Department of Health and Mental Hygiene. §§ 9–501 to –521. Such a plan must be consistent with all local zoning regulations, and must provide the Department with adequate information regarding such regulations. §§ 9–505(a), –506(a). Section 9–502(c) states that "[a]ny rule or regulation [of the Department] adopted under this subtitle does not limit or supersede any other county, municipal, or State law, rule, or regulation that provides greater protection to the public health, safety, or welfare."

The Department may not issue a permit for a sewage sludge composting facility unless the facility complies with all applicable county zoning and land use requirements and is not opposed by the local legislative body. § 9–212(a)(4). In promulgating regulations regarding water pollution, the Department is required to consider local zoning laws. § 9–313(b)(4). The governing bodies of counties are empowered to create sanitary districts with authority to engage in a variety of sewage management activities. §§ 9–601 to –699. The governing bodies of political subdivisions are similarly empowered to create sewer and water authorities, §§ 9–901 to –958, and this power "[i]s supplemental and additional to powers contained in other laws; and ... [d]oes not derogate any existing power." § 9–902(c)(2) and (3).

Sections 9–701 to –717 grant municipal authorities various powers regarding the acquisition, extension, and maintenance of sewage systems. Sections 9–720 to –727 authorize political subdivisions to establish certain fees for sewage-related services and activities. Section 9–721 (a) states that "[t]he powers granted to political subdivisions by Part III of this subtitle are supplementary to any other powers of the political subdivisions." Sections 9–801 to –814 authorize municipalities to issue bonds to finance the development of sewage facilities, and this authority too is "[s]upplemental

to the powers granted by any general, special, or local law."
§ 9–802(a)(1). Sections 9–1101 to –1207 grant to specific
local authorities a variety of powers relating to sewage
management.

These statutory provisions manifest a general legislative
purpose not to prohibit local legislation, but rather to coor-
dinate and supplement such legislation through the enact-
ment of a statewide regulatory panoply. Indeed, this body
of state law clearly contemplates a pervasive and vital role
for local legislation in the field of sewage management.
Notwithstanding this general legislative purpose, however,
Ad+Soil contends that the General Assembly did intend to
preclude local legislation in the specific area of sewage
utilization and management in which Ad+Soil is engaged:
the transportation, storage, and distribution of processed
sewage sludge. Ad+Soil's purported evidence of such a
legislative purpose is both inconclusive and unpersuasive.

Our cases indicate that the primary indicia of a legislative
purpose to pre-empt an entire field of law, absent express
statutory language to this effect, is the comprehensiveness
with which the General Assembly has legislated in the field.
At the time Ad+Soil applied for its state permits, the state
law governing sludge utilization operations such as
Ad+Soil's was far from comprehensive. The sole state
enactment in the field was § 9–210(b) of the Health-Envi-
ronmental Article, which provided as follows:

"Permit to handle, burn, or store sewage sludge.—(1)
An individual or corporation for commercial purposes and
a municipality, county, district, or institution may not
engage in collection, handling, burning, storage, or trans-
portation of sewage sludge without a permit from the
Secretary [of the Department].

(2) The Secretary shall adopt appropriate rules and
regulations relating to permissible uses and methods of
collection, handling, burning, storage and transportation
of sewage sludge."

The regulations promulgated by the Department in response to the statutory mandate of § 9–210(b)(2) added little specificity to the statutory language. The permit application process is set forth in 9 COMAR 10.17.10.04:

"A. Requirement for Application. Applications for permits under the provisions of Regulation .03, above, shall be submitted to the Department. They shall be accompanied by sufficient information to enable the Department to review the proposed project to determine if its implementation is consistent with Maryland laws and regulations relating to the protection of the public health and safety.

B. Engineering Reports, Plans, and Specifications. The Department may require submission of a complete engineering report, plans, and specifications covering the proposed project—prepared, signed, and bearing the seal of a registered professional engineer.

C. Requirement for Specific Information. Applications for permits shall include a brief description of the type and method of operation, types and numbers of vehicles and equipment to be used, the source of the sludge, location, and other information the Department may require. Plans for routine monitoring of sludge, ground water, air, and compost quality may be required."

The regulations do not provide for a public hearing or other mechanism for public comment as part of the application process for facilities such as Ad+Soil's, and impose no particular requirements or standards on the operation of such facilities except that they not cause "public health hazards, deleterious effects on environmental health, or health nuisances." 9 COMAR 10.17.10.05(A)(1). The regulations do, however, contain enforcement provisions outlining the procedures for permit suspension and reinstatement. *See* 9 COMAR 10.17.10.06.

By chapters 748 and 779 of the Acts of 1984, subsection (b) of § 9–210 was repealed and a far more detailed section, § 9–210.1, was enacted governing sewage sludge utiliza-

tion.[9] The new statute imposes a number of monitoring and record keeping requirements, specifically directing a permit holder to:

"(1) Keep records, including records of the source and amount of sludge for each truckload delivered to the site on a daily basis;

(2) Make reports, including reports of sludge analysis as often as necessary to assure the sludge is in compliance with permit requirements;

(3) Install, calibrate, use, and maintain monitoring equipment or methods, including biological monitoring methods and monitoring wells where appropriate;

(4) Obtain samples in accordance with the methods, at the location, at the intervals, and in the manner the Department requires; and

(5) Provide to a representative of the Department or the local health official any information that the Department reasonably requires." § 9–210.1(k).

Subsection (g) of § 9–210.1 provides for the inspection of sludge utilization sites by both the Department and local health officials, and authorizes the issuance of stop work orders. The subsection further states that "[i]f the local health official is not satisfied that the enforcement measures of the Department are adequate to protect the public health and safety of the county, . . . the county may seek injunctive relief or other appropriate remedies in the respective circuit court." § 9–210.1(g)(3)(ii)(4).

The Department may suspend, revoke, or modify a permit in response to a falsified application, a violation of § 9–210.1 or the Department's regulations adopted under this section, deviation from plans or specifications, refusal to allow an inspector onto the site, or other good cause. § 9–210.1(h). Subsection (n) provides civil penalties for

---

**9.** Chapters 748 and 779 also enacted a new definitional provision, § 9–201(h), which defines "sewage sludge utilization" as "the collection, handling, burning, storage, treatment, land application, disposal, or transportation of sewage sludge."

violations of the Department's regulations or the terms of a permit, and subsection (m) authorizes the Department to seek an injunction to prevent the violation of any regulation, order, or law concerning sludge utilization.

The Department is required to send to the appropriate local health official a copy of any enforcement notice, complaint, or order. § 9–210.1(*l*). The county, municipal corporation, and adjoining landowners are accorded standing to bring an action compelling a permit holder's compliance with § 9–210.1 and the terms of the permit, and to intervene in civil proceedings and contested cases involving the sludge utilization site. § 9–210.1(i) and (j). Subsection (f) requires the Department to maintain a permanent public record of all sludge utilization permits, so the public can identify all permits issued for a particular site.

The Department is directed to adopt regulations to carry out the provisions of § 9–210.1, and in so acting to consider:

"(i) Alternative utilization methods;

(ii) Pathogen control;

(iii) Advertising requirements for public hearings and public information meetings;

(iv) Performance bonding, liability insurance, or other securities;

(v) Procedures for notifying local units of government and other interested parties; and

(vi) Adequate standards for transporting sludge, including requirements for the enclosure or covering of sewage sludge during transportation." [10] § 9–210.1(a)(2). With respect to the land application of sludge, the statute sets forth additional specific issues to be treated by the Department in its regulations. § 9–210.1(a)(3). Subsection (c) creates a Sewage Sludge Utilization Fund to be used by the Department for specified sludge-related activities, in-

---

**10.** As of the filing of this opinion, the Department has not adopted additional regulations in response to the mandate of § 9–210.0(a) although it has conducted hearings concerning the adoption of certain proposed regulations. *See* 12 Md.Reg. 2362–81 (November 22, 1985).

cluding the emergency removal of sludge or mitigation of the adverse effects of sludge utilization.

The provisions governing the permit application process are set forth in subsection (e); paragraph (4) thereof lists five prerequisites to the issuance of a permit, requiring an applicant to:

"(i) File with the Department acceptable evidence of a bond or other security that the Department requires under paragraph (7) of this subsection;

(ii) Obtain the written consent of the landowner where the sewage sludge will be applied, including an agreement that the landowner may not violate applicable provisions of the permit;

(iii) Agree to permit access to the sewage sludge utilization site for the purposes of any inspection permitted under this section;

(iv) Satisfy the other requirements of this section; and

(v) Pay the application fee required by the Department."

Upon receipt of a permit application, the Department must publish notice in the local newspaper, and forward copies of the application and the notice to local officials for their review and comment. § 9–210.1(b)(1) and (e)(9). Paragraph (6) directs the Department to deny an application if it concludes that

"(i) The sewage sludge utilizer cannot utilize sewage sludge without imposing an undue risk to the environment or the public health, safety, or welfare, or without otherwise violating the provisions of this section; or

(ii) The sewage sludge generator from which the sludge originated has failed to pay the applicable generator fees."

As a condition to retaining their permits, permit holders are required to maintain performance bonds. § 9–210.1(e)(7)(i).

Because Ad+Soil's sludge utilization permits were issued before July 1, 1984 and do not expire until December 27,

1986, Ad+Soil has not been subjected to the permit application and notice requirements of § 9–210.1(b) and (e). *See* § 9–210.1(e)(8). Thus, the relevant body of state law for purposes of our inquiry is former § 9–210(b) and current § 9–210.1 exclusive of the application and notice provisions of subsections (b) and (e).

As Ad+Soil points out, the relevant body of state law does indeed regulate many aspects of sewage sludge utilization. It is not, however, so comprehensive that " 'the acceptance of the doctrine of pre-emption by occupation is compelled.' " *McCarthy, supra,* 280 Md. at 639, 374 A.2d 1135 (quoting *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 255 A.2d 376 (1969)). Most notably for the purposes of this case, the state law does not purport to regulate in any way the actual location of sludge utilization sites, or the construction or arrangement of the facilities on such sites.

Furthermore, the possibility of a two-tiered regulatory process under which local jurisdictions would retain authority to enforce zoning controls against state permit holders does not implicate any of the unreasonable consequences alluded to in *Montgomery Ass'n, supra,* since the state and local legislation would regulate disparate aspects of the activity. Finally, we note that local regulation of potentially obnoxious uses of land far antedates the state statutes in question, and as previously observed, the General Assembly is presumed to be aware of existing local law when it legislates. That the state legislature did not address the interaction of its statutes with pre-existing local zoning laws suggests that it intended no change in the applicability of the local laws.

Although the state statutes governing sludge utilization fail to manifest a legislative purpose regarding pre-emption, a statement of legislative purpose relevant to this issue is articulated elsewhere in the Code in the most unequivocal terms. Section 4.01(d)(2) of Article 66B sets forth one of the cornerstones of this state's system of land use control:

"It has been and shall continue to be the policy of this State that planning and zoning controls shall be implemented by local government." This policy is evident throughout the provisions of the Code governing zoning and land use regulation. *See, e.g.,* Article 66B; Article 23A, § 2(30); Article 23B, § 22(55); Article 25, § 3; Article 25A, § 5(X); Article 25B, § 13. In view of such a clearly established legislative policy, evidence of a countervailing legislative purpose to prohibit local zoning control in the field of sludge utilization must be strong indeed. Having found no such compelling evidence, we agree with the court below that the General Assembly has not pre-empted this field and has not, therefore, precluded the enactment or enforcement of consistent local zoning laws.

Most courts that have considered pre-emption issues under statutes analogous to those now before us have held that they do not preclude local zoning legislation. *See, e.g., Decoulos v. City of Peabody,* 360 Mass. 428, 274 N.E.2d 816, 817–18 (1971) (state health and sanitation statutes held not to preclude local zoning regulation of sewage facilities); *Jamens v. Avon Tp.,* 71 Mich.App. 70, 246 N.W.2d 410, 414 (1976) (Michigan's Garbage and Refuse Disposal Act held not to preclude consistent local zoning provisions regulating sanitary landfills); *Omaha Fish & Wildlife v. Community Refuse,* 208 Neb. 110, 302 N.W.2d 379, 381 (1981) (Nebraska's Environmental Protection Act held not to preclude local zoning regulation of solid waste disposal facilities); *Derry Sand & Gravel v. Town of Londonderry,* 121 N.H. 501, 431 A.2d 139, 140–41 (1981) (state statute governing private disposal sites held not to pre-empt local land use regulations); *Monroe-Livingston v. Town of Caledonia,* 51 N.Y.2d 679, 417 N.E.2d 78, 80, 435 N.Y.S.2d 966 (1980) (New York's Environmental Conservation Law held not to pre-empt local zoning ordinance regulating sanitary landfills); *Hulligan v. Columbia Tp. Bd. of Zoning Appeals,* 59 Ohio App.2d 105, 392 N.E.2d 1272, 1273–74 (1978) (state regulation of sanitary landfills held not to pre-empt local zoning regulations); *Greene Tp. v. Kuhl,* 32 Pa.Cmwlth.

592, 379 A.2d 1383, 1385 (1977) (Pennsylvania's Solid Waste Management Act held not to pre-empt local zoning regulation of sanitary landfill); *In re Patch,* 140 Vt. 158, 437 A.2d 121, 130 (1981) (state law governing sanitary landfill dumps held not to pre-empt local zoning regulations). *But see, e.g., Carlson v. Village of Worth,* 62 Ill.2d 406, 343 N.E.2d 493, 494–96 (1975) (Illinois' Environmental Protection Act held to pre-empt local regulation of sanitary landfills); *Chester Tp. v. Environmental Protection Dep't,* 181 N.J. Super. 445, 438 A.2d 334, 337–39 (App.Div.1981) (New Jersey's Solid Waste Management Act held to pre-empt local regulation of sanitary landfills).

### B. Conflict

■ We next consider Ad+Soil's argument that the October 1983 amendments to the Zoning Ordinance conflict irreconcilably with the state statutes governing sludge utilization and are therefore invalid. Specifically, Ad+Soil posits three areas of conflict: that the Ordinance purports to vest in the Board of Appeals the authority to prohibit the operation of a sewage sludge utilization facility for which state permits have been issued; that the Ordinance imposes greater setback requirements than do Ad+Soil's state permits; and that the Ordinance allows the Board to consider whether a sludge utilization facility for which a conditional use permit is sought is likely to generate offensive odors, even though odor problems are also regulated by the Department.

In support of its first objection, Ad+Soil places reliance upon our holding in *Sitnick, supra:* "A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted." 254 Md. at 317, 255 A.2d 376 (emphasis in original). Ad+Soil contends that its state permits unconditionally authorize it to operate its facility at the Queen Anne's County and that the Board, acting under the auspices of the Ordinance, has impermissi-

bly "prohibit[ed] what the State has ... expressly permitted."

Ad+Soil has misconstrued the nature of the state's approval represented by the two permits. As we see it, the state statutes governing sludge utilization evidence no legislative purpose to preclude the enactment and enforcement of local zoning regulations. The General Assembly simply did not legislate upon the interplay between the state statutes and pre-existing local zoning regulations, thereby suggesting that it intended no change in the applicability of such local regulations. Thus, the state permits must be viewed as authorization to operate a sewage sludge facility, subject to the lawful requirements of the applicable zoning regulations. Because Ad+Soil's compliance with the Zoning Ordinance is in effect an implicit condition in the state permits, the Ordinance cannot be said to prohibit what the permits authorize.

Furthermore, the Ordinance manifestly does not prohibit the operation of a facility such as Ad+Soil's; rather, it expressly allows such a facility to operate subject to its compliance with certain enumerated requirements. These earlier enumerated requirements are not inherently unreasonable, but are typical of those customarily imposed on the operation of a conditional use. *See Shultz v. Pritts,* 291 Md. 1, 11–13, 21–23, 432 A.2d 1319 (1981); 6 P. Rohan, *Zoning and Land Use Controls* § 44.03, .04 (1986). Indeed, the record contains undisputed evidence that Ad+Soil could have situated its facilities on the site in compliance with the applicable setback requirements of the Zoning Ordinance had it ascertained these requirements before constructing the facilities. Moreover, Ad+Soil's president testified that it is possible to operate such facilities without generating an offensive odor. Thus, this is not a case like *County Council v. Investors Funding,* 270 Md. 403, 420–24, 312 A.2d 225 (1973) or *Rockville Grosvenor, Inc. v. Mont. Co.,* 289 Md. 74, 95–99, 422 A.2d 353 (1980) in which a local ordinance is so oppressive or burdensome that it is tantamount to a prohibition.

Nor is there merit in Ad+Soil's second contention—that the setback requirements in § 16.202 of the Zoning Ordinance conflict with those of the state permits. As earlier indicated, neither the applicable state statutes nor the Department's regulations address setback requirements for sewage sludge facilities. The existing setbacks at Ad+Soil's site are required by the state permits only in the sense that they are contained in the site plans prepared and submitted by Ad+Soil to the Department at the time it sought the Department's approval of its permit application. While Ad+Soil would have to obtain an amendment to its state permits before altering its site plan, it has not applied for such an amendment to conform its facilities to the requirements of the Zoning Ordinance. Therefore, it has failed to establish that an irreconcilable conflict exists between the Ordinance and the applicable state law.

We also note that § 7.02 of Article 66B of the Code, entitled "Conflict with other laws," provides in relevant part:

"Whenever the regulations made under the authority of this article require a greater width or size of yards, courts, or other open spaces, or require a lower height of building or less number of stories, or require a greater percentage of lot to be left unoccupied or impose other higher standards than are required in any other statute or local ordinance or regulations, the provisions of the regulations made under authority of this article shall govern."

Thus, even if the conflict alleged by Ad+Soil actually existed, the greater setback requirements of the Zoning Ordinance would prevail in this case.

We next consider Ad+Soil's third contention regarding the possible conflict inherent in the Board of Appeals' consideration of alleged offensive odors generated by Ad+Soil's operations. In its opinions in both Cases CU–56 and CU–61, the Board of Appeals discussed Ad+Soil's odor problem but did not premise its denial of Ad+Soil's zoning application on that ground. In each case, the Board first

evaluated Ad+Soil's applications for variances from the setback requirements of § 16.202, and concluded that the company had failed to satisfy the requisite criteria for the issuance of variances. The conditional use applications were denied, not because of odor problems, but because Ad+Soil had failed to comply with the applicable setback requirements and was unable to avoid these requirements by obtaining the necessary variances. The Board's discussion of Ad+Soil's odor problem was thus not an issue properly before the circuit court on review.

Finally, Ad+Soil maintains that § 4.01(d)(5)(iv) of Article 66B deprives the county of the authority to enact § 16.202 of the Zoning Ordinance, which makes sludge utilization a conditional use in Queen Anne's County. Paragraph (5) of subsection (d) provides in relevant part that "[t]he powers granted to the county *pursuant to this subsection* shall not be construed: ... (iv) To preempt or supersede the regulatory authority of any State department or agency under any public general law." (Emphasis added.) The short answer to Ad+Soil's assertion is that, as previously explained, the county's authority to adopt the Zoning Ordinance is found in § 4.01(a) and (b). Because § 4.01(d)(5)(iv) expressly qualifies only those powers granted to the county by subsection (d), this provision does not limit the county's authority under subsections (a) and (b) to adopt § 16.202 of the Zoning Ordinance.

### IV.

As we have frequently indicated, the order of an administrative agency, such as a county zoning board, must be upheld on review if it is not premised upon an error of law and if the agency's conclusions " 'reasonably may be based upon the facts proven.' " *Annap. Waterfront Co.,* *supra,* 284 Md. at 399, 394–99, 396 A.2d 1080 (quoting 4 K. Davis, *Administrative Law* § 29.05 (1958)); *see also* *Schultz, supra,* 291 Md. at 11–12; *Sembly v. County Bd. of* *Appeals,* 269 Md. 177, 182–84, 304 A.2d 814 (1973); *Prince* *George's Co. v. Meininger,* 264 Md. 148, 152–54, 285 A.2d

649 (1972); *Zengerle v. Bd. of Co. Comm'rs*, 262 Md. 1, 17–18, 276 A.2d 646 (1971).

■ Section 16.202 of the Zoning Ordinance imposes the following setback requirements upon sewage sludge storage and distribution facilities:

"[T]he storage location shall be located a minimum of one hundred (100) feet from any property line, two hundred (200) feet from any road, one hundred fifty (150) feet from any drainage ditch, swale or gully, and a minimum of three hundred (300) feet from any stream, lake, pond or other body of water."

The record contains uncontroverted testimony that Ad+Soil's facilities failed to comply with any of these setbacks. In order to obtain a conditional use permit, therefore, it was necessary for Ad+Soil to obtain variances from these setback requirements.

In evaluating Ad+Soil's applications, the Board of Appeals explained that the source of its authority to issue variances is § 20.46 of the Zoning Ordinance, which provides that

"[w]here by reason of the exceptional narrowness, shallowness, or unusual shape of a specific piece of property on the effective date of this Ordinance, or by reason of exceptional topographic conditions or other extraordinary situation or special condition of such piece of property in question, the literal enforcement of the requirements of this Ordinance would make it exceptionally difficult, if not impossible, to comply with the exact provisions of this Ordinance and would cause unwarranted hardship and injustice—unnecessary to carry out the purpose and intent of this Ordinance—the Board shall have the power upon appeal in specific cases ... to authorize such variance from the terms of this Ordinance as will not be contrary to the public interest and will relieve such hardship...."

The Board further recognized that this authority is limited by § 20.461:

"No such variance in the provisions or requirements of this Ordinance shall be authorized by the Board unless the Board finds, beyond reasonable doubt, that all the following facts and conditions exist:

(a) That there are exceptional or extraordinary circumstances or special conditions applying to the property in question, or to the intended use of the property, that do not apply generally to other properties or classes of uses in the same zoning district.

(b) That such variance is necessary for the preservation and enjoyment of substantial property rights possessed by other properties in the same zoning district and in the same vicinity.

(c) That the authorizing of such variance will not be of substantial detriment to adjacent property, and will not be contrary to the purpose of this Ordinance or the public interest."

The essence of Ad+Soil's argument before the Board and before this Court is that the setback requirements of § 16.202 would cause Ad+Soil an unwarranted hardship because it had obtained its first state permit and constructed its transfer station before it learned of these local requirements. It is undisputed that Ad+Soil's site is large enough to comply fully with all the setback requirements. The Board declined to grant the variances, concluding that Ad+Soil's "hardship" was self-inflicted, and, in any event, that it was not the result of exceptional or extraordinary characteristics of the land itself and therefore not the kind of hardship cognizable under the Zoning Ordinance. Having denied the variances, the Board was compelled to deny the conditional use permits as well.

We think the Board's decisions in these cases find adequate factual support in the record, and reflect no error of

law. We therefore conclude that the circuit court was correct in affirming the Board's orders.[11]

JUDGMENT AFFIRMED, WITH COSTS.

---

11. The circuit court, in the declaratory judgment suit, will undoubtedly consider dissolving the interlocutory injunction entered in that case.