600 A.2d 864

Charles HOLMES, et al.

v.

MARYLAND RECLAMATION ASSOCIATES, INC.

No. 2003 Sept. Term, 1990.

Court of Special Appeals of Maryland.

Jan. 29, 1992.

James R. Eyler, Baltimore (Kara M. Miller and Miles & Stockbridge on the brief) for appellant, County Council.

Patricia K. Nimmerrichter, Upper Marlboro (Bryan & Nimmerrichter on the brief) for appellants, intervenors.

Scott Burns and Charles Christianson, Baltimore, for amicus curiae, The Community Coalition of Harford County.

Robert J. Carson (Randall M. Lutz, Ronald G. Dawson, Patricia McHugh Lambert, Smith, Somerville & Case, Baltimore, William D. Hooper and Lentz, Hooper, Jacobs & Blevins, P.A., Bel Air, on the brief), for appellee, Maryland Reclamation Associates, Inc.

Argued before MOYLAN, ALPERT and MOTZ, JJ.

ALPERT, Judge.

In this, the final decade of the twentieth century, we are witness to the ceaseless changes in the law that have occurred over the past nine decades. Against the background of widespread social change, we have overhauled and augmented much of the law that prevailed at the turn of the century. There came a time when we

> had to reckon with the newest social problem to demand the center of the stage, the problem of mankind and the

physical environment. Air and water pollution, urban squeeze, and other symptoms of distress were old enough; there had always been voices crying in and for the wilderness. But the voices became more strident from the 1960s on. A real sense of doom began hanging over this small and limited world. Many sources fed the ecological movement.... [T]he crisis was real. Resources were *not* infinite. Big business was poisoning the rivers and darkening the air; lumber companies were chopping down irreplaceable trees; cities were pouring tons of muck into lakes and oceans; highway engineers were driving concrete paths through pieces of the American heart and heritage.

L. Friedman, *A History of American Law*, 680 (1973). Recognizing the destruction, the public pressed for legal action to preserve and manage the planet's scarce and threatened resources.

*   *   *   *   *   *

This case involves a proposed rubble landfill in Harford County. The principal issue is whether the state laws governing landfills preclude Harford County, in the guise of removing the proposed landfill site from its Solid Waste Management Plan, from substituting itself for the state in the permit review process. The Circuit Court for Harford County (Whitfill, J.) entered a judgment against the Harford County Council, which the Council now appeals. For the reasons that follow, we affirm.

## FACTS AND PROCEEDINGS

Maryland Reclamation Associates (hereinafter MRA) wishes to establish in Harford County a landfill for receiving rubble deposits. In late August, 1989, MRA contracted to purchase property located on Gravel Hill Road, Harford County. The land had been mined extensively since the mid–1950s, pursuant to a valid surface mining permit issued by the State of Maryland for a 7.39 acre portion of the property. The state also had issued an industrial waste management permit covering a twenty eight acre portion of

the property, allowing interment of broken concrete, tree stumps, and brush. This section of the property had been used as a rubble fill for more than four years.

MRA applied to the Maryland Department of the Environment (hereinafter MDE) for its approval of another rubble landfill at the Gravel Hill Road site. Prior to, or in conjunction with, this application, MRA was involved in discussions with the Harford County Department of Public Works and MDE concerning this proposed facility. The Department of Public Works is part of the Harford County government's executive branch.

MRA asked the Harford County Council (hereinafter the Council) to include MRA's proposed landfill in Harford County's Solid Waste Management Plan (hereinafter SWM Plan or Plan). The Harford County Department of Public Works supported MRA's application, and requested that the proposed landfill include a cell for asbestos interment because the County's SWM Plan had no designated asbestos interment sites. MRA agreed to this request.

At its November 7, 1989 meeting, the Council conducted a public hearing to consider the Gravel Hill Road site as a landfill. The Council heard comments from the project's proponents and opponents, plus it received detailed technical information.

At its next session on November 14, 1989, the Council passed a motion that approved including the Gravel Hill Road project in the County's SWM Plan. The Council's attorney had advised the Council that it must act on the matter before November 17, or MDE would treat MRA's request as having been approved.[1] Council members Fielder, Hooper, Hatem, and Hardwicke voted to include the site in the Plan. Council members Risacher and Parrott abstained, stating that they had inadequate information to make the decision, particularly with respect to the asbestos

---

1. The Council's attorney testified that MDE told him that state law required the Council to act within this time frame.

disposal. Council member Schafer abstained because his son, Richard Schafer, is MRA's president. The Council also mandated twenty seven conditions governing the landfill's operation. MRA agreed to these conditions in discussions with the Executive Branch and with the Council. The Council transmitted to MDE its decision to include the site in the County's SWM Plan.

MDE gave initial approval to MRA's project on November 20, 1989. MRA then filed with MDE the extensive reports and drawings required to obtain the next level of MDE approvals.

After the Council agreed to include the rubble landfill in the County's SWM Plan, MRA's attorney, William Hooper, asked the Council to clarify two of the aforementioned conditions. He discussed this with the Council's president, John Hardwicke. Hardwicke apparently took the position that the language Hooper requested was in fact a clarification and not a substantive modification of the conditions previously approved. On December 8, 1989, Hardwicke directed the Secretary of the Council to send to John Lawther, Chief of MDE's Solid Wastes Division, a letter noting these clarifications. Hardwicke disclosed to the other Council members neither the clarifications nor the letter. When this later came to the Council's attention, it passed a motion and sent MDE a letter indicating that the conditions as originally stated were what the Council intended and that, in the Council's opinion, the letter of clarification was in fact a substantive modification of the conditions. The Council took this action on February 6, 1990. It made no attempt to rescind its prior decision to include MRA's property in the County's SWM Plan.

MRA proceeded with its purchase of the property. The deal closed on February 9, 1990, and MRA paid a $732,500 purchase price, financed by an $800,000 mortgage loan from the Bank of Maryland.

On February 13, 1990, Council members Wilson and Parrott introduced Resolution 4-90. The resolution follows:

A RESOLUTION amending the Harford County Solid Waste Management Plan to delete the Gravel Hill Road Rubble Landfill.

WHEREAS, On November 14, 1989, the County Council approved a request to add the proposed Gravel Hill Road Rubble Landfill to the county's Solid Waste Management Plan; and

WHEREAS, Ensuring an adequate and safe water supply for Harford County residents is an essential part of every land use issue decision; and

WHEREAS, In order to make a responsible land use decision, the Council needed additional time to obtain the necessary scientific information on the landfill's possible effect on the surrounding community's water supply, but was required to act on the request by November 17, 1989 under Maryland Department of Environment regulations; and

WHEREAS, A number of residents of the Gravel Hill Road area had problems with their existing water supply, and these problems may or may not have been caused by mining at the site of the proposed rubble landfill of Gravel Hill Road; and

WHEREAS, Under the current proposal for the rubble landfill the residents of the Gravel Hill Road area have no guarantee that further excavation of the landfill site will not affect their water supply; and

WHEREAS, The Harford County Water and Sewerage plan does not include the Gravel Hill Road area within the area scheduled to receive public water in the next 10 years.

NOW, THEREFORE, BE IT RESOLVED, by the County Council of Harford County, Maryland, that the Harford County Solid Waste Management Plan is hereby amended to delete the Gravel Hill Road Rubble Landfill from the Plan.

Council membership had changed by this time. Hardwicke had resigned to accept a position as the state's Chief Administrative Law Judge, and the Council had appointed

Jeffrey Wilson to fill that vacancy. Wilson and Council member Parrott introduced Resolution 4–90. The Council held four public hearings concerning Resolution 4–90's adoption, during which it heard oral statements, and admitted letters and other exhibits.

At the final vote on this resolution, which the Council passed on May 8, 1990, Schafer again abstained, Fielder abstained, and Hooper abstained on advice from the Ethics Board because he is a principal in Harford Sanitation, which is in the business of trash collection. Council members Hatem, Risacher, Parrott, and Wilson voted to adopt the resolution. Neither Wilson, Risacher, nor Parrott participated in the November vote to amend the SWM Plan to include MRA's proposed rubble fill site: Wilson was not then a Council member, and Risacher and Parrott had abstained.

After the Council passed Resolution 4–90, MDE stopped processing MRA's application for an expanded rubble fill permit before it completed its technical evaluation of MRA's secondary phase applications.

MRA filed suit in the Circuit Court for Harford County against the County Council of Harford County and Harford County, Maryland, seeking declaratory relief and alleging that the Council's decision to delete its proposed landfill from the County's SWM Plan was unconstitutional under the federal and state constitutions, a breach of contract, ultra vires, and barred by the doctrines of estoppel and waiver. The Circuit Court entered a comprehensive, carefully prepared Memorandum Opinion with an Order granting MRA's Motion for Summary Judgment and declaring the resolution void, based on its determination that the Council could not delete the proposed rubble landfill site from its SWM Plan because doing so exceeded its delegated authority, and because MRA had vested rights with which the Council could not interfere. Finally, the court found that in enacting Resolution 4–90, the Council failed to follow proper procedures.

The Council now appeals the Circuit Court's decision, raising the following issues:

I. Was the trial court's grant of MRA's motion for judgment improper because the Council may lawfully enact legislation which deletes the proposed rubble fill site from the County's SWM Plan?

II. Did the trial court act improperly in granting the motion for judgment because the Council acted in its legislative capacity, and not adjudicatively?

III. Did the trial court err in holding that the Council failed to follow proper procedures when it enacted Resolution 4–90?

### STATUTORY BACKGROUND

The trial court outlined the statutory and regulatory provisions governing planning for and issuing permits to landfills. In determining whether the Council acted within the scope of its authority in that scheme, it was necessary for the court to determine whether there had been compliance with those provisions.

The state delegates to local county governments the authority to plan facilities for solid waste disposal. The Code of Maryland Regulations details the counties' responsibilities. Each county must adopt and maintain a comprehensive SWM Plan encompassing a ten year period. Md. Regs.Code tit. 26, § 26.03.03.02(A) (1988). Another chapter details the regulations applicable to persons "engaged in the construction and operation of all solid waste acceptance facilities." *Id.* § 26.04.07.01. *See generally id.* ch. 07.

The regulations also specify each chapter's contents and their arrangement. *See id.* § 26.03.03.03. The Plan's Introduction must certify that the Plan is consistent with state regulations, and that the county governing body has officially adopted it. *See id.* § 26.03.03.03(A). Chapter One must contain a discussion of the county's goals, and outline the county governmental structure relevant to the SWM Plan. It must also contain a discussion of pertinent laws

and regulations. *See id.* § 26.03.03.03(B). Chapter Two must contain present and anticipated population estimates, a map of municipalities and federal facilities, a discussion of existing relevant county zoning requirements, and the status of the county comprehensive land-use plan. *See id.* § 26.03.03.03(C). Chapter Three is to include a table showing the annual rate of garbage generation, and a description of the solid waste entering or leaving the county for disposal. The chapter also must include a description of the county's waste collection systems, and information about each existing public or private waste acceptance facility. *See id.* § 26.03.03.03(D). Chapter Four must contain the county's assessment of the necessity to alter its existing systems in the next decade, considering constraints enumerated in this section. *See id.* § 26.03.03.03(E). Finally, Chapter Five is to include a county plan of action discussing the facilities to be in use during the planning period.

A person constructing, operating, altering, or extending a rubble landfill must first obtain a permit. *Id.* Md.Regs. Code tit. 26 § 26.04.07.04(A). State law delegates to the Secretary of the Environment the authority to issue permits for refuse disposal systems. Md.Envir.Code Ann. § 9–204(d) (1987); *see also* Md.Regs.Code tit. 26, § 26.04.07.-02(B)(2) (1988) (defining "Approving Authority" as "the Secretary of the Environment or the Secretary's designee").

Specific regulations govern rubble landfills, including their design and operational requirements. *Id.* § 26.04.-07.13 (1988). Regulations .14–.17 detail MDE's responsibility to protect health and safety with respect to issuing permits for sanitary landfills. The process of issuing permits has three phases, each described in detail. *See id.* §§ .14 (Phase I); .15 (Phase II); .16 (Phase III). The trial court noted that "[i]t appears that any broad grant of police power delegated to the County governing body by the State ... has been reclaimed by the State through these regulations, seemingly due to MDE's greater wealth of expertise in the area."

The court concluded that state authority and county authority substantially overlap in regulating solid waste management. With respect to the planning process, a county must review its SWM Plan at least once every two years, but MDE must approve any revisions the county makes. *See* Md.Envir.Code Ann. § 9–503 (1987) (requiring counties to review plans at two year intervals); Md.Regs. Code tit. 26, § 26.03.03.05E (1988) (MDE must act within 90 days); Md.Envir.Code Ann. § 9–507(a) (1987) (MDE has power to approve proposed Plan revisions).

The permit issuing process evidences a similar overlap in responsibilities. The state has most of the responsibility for issuing rubble landfill permits, but the County nevertheless has a limited role: within boundaries established by the state, the County specifies the types of waste that may be disposed of in a rubble landfill. *See* Md.Envir.Code Ann. § 9–210 (prerequisites for issuing permit).

(a) *In general.*—The Secretary may not issue a permit to install, materially alter, or materially extend a refuse disposal system ... until the Department has a written statement from the applicant that the refuse disposal system conforms to the county solid waste management plan and meets all applicable zoning and land use requirements.

(b) *Rubble Landfills.*—(1) The Secretary may not issue a permit for a rubble landfill ... unless the county in which the rubble landfill is located has specified the types of waste that may be disposed of in that rubble landfill in its county solid waste management plan under Subtitle 5 of this title.

(2) The types of waste that a county may allow to be disposed of in a rubble landfill under this section include:

(i) Trees;

(ii) Land clearing debris that is not a controlled hazardous substance ...

(iii) Demolition debris that is not a controlled hazardous substance ...

(iv) Construction debris that is not a controlled hazardous substance ...

(3) The following types of waste may be disposed of in a rubble landfill subject to the regulations adopted under this subtitle if the disposal of these wastes is expressly approved by the county in its county solid waste management plan:

(i) Asbestos;

(ii) White goods; and

(iii) Used tires.

*Id.* The trial court concluded that this section does not "delegate any duty to the County, but merely reiterates the County's authority in the planning stage to adopt and maintain the solid waste management plan and zoning/land use requirements." [2]

Finally, the Maryland Regulations specify that:

A. ... [E]ach county plan shall be:

(1) Revised if deemed necessary by the Department;

(2) Reviewed in its entirety at the interval specified by Environment Article, Title 9, Subtitle 5, Annotated Code of Maryland [at least every two years]; and

(3) Revised to include the installation or extension of either a solid waste acceptance facility, or solid waste disposal system, *before* the issuance of a permit by the Department ...

Md.Regs.Code tit. 26, § 26.03.03.05(A) (1988) (emphasis added).

■ The trial court concluded that regulation (A)(3), *supra*, could be interpreted in either of two ways. It could mean that a county possesses veto power over whether a

---

**2.** Before July 1, 1988, section 9–210 gave the County much broader power over proposed landfills. At that time, MDE could not issue a permit to a landfill site without the County Council's or the Board of County Commissioners' written approval. That section was repealed effective July 1, 1988, however, and replaced with the current part (a). The legislature added part (b) in 1989, authorizing the County to make specific decisions as to which types of waste can be deposited in a rubble landfill, within the statute's narrowly specified perimeter.

proposed facility actually is given a permit, exercised by the county's decision whether to include the facility in its SWM Plan. Or it could mean that a county must update its Plan—that the regulation is an obligation the state placed on the counties, and not a grant of power.

The court found the latter interpretation more compelling, and so do we. If the regulation constituted what amounts to county veto power, this would conflict with the Environment Article's section 9–210, *supra.* The court's finding that the regulation merely compels a county to update its Plan is consistent with the present section 9–210. It is a "final step in the permitting process, *i.e.* an assurance that all operating landfills are properly designated on the County's SWM Plan." The court also stated that:

> Specific sites are not, and need not, be identified in advance as a part of the plan process. The Plan does, however, identify all existing sites. Once all reviews are complete and a site is ready for approval, it is therefore rational for the MDE to require through its regulations that the specific site be included on the SWM Plan. This interpretation not only agrees with the amended § 9–210, but also fits logically into the entire statutory scheme of authority which has been previously described.

### HARFORD COUNTY'S SOLID WASTE MANAGEMENT PLAN

Harford County adopted its first SWM Plan in 1974 pursuant to state statutory requirements.[3] The Council has amended the plan from time to time, but the initial plan remains Harford County's SWM Plan. The Plan contains nine sections. Section One introduces the Plan, Section Two

---

**3.** *See* Md.Health–Gen.Code Ann. § 387C (1957) (mandating the plan's development, adoption, and supervision). The state subsequently transferred oversight responsibility from the Department of Mental Health and Hygiene to the new Maryland Department of Environment. *See* 1982 Acts, ch. 240. The statutory requirements for the county plans now are found in the Environment Article's Title 9, and in the Code of Maryland Regulations. *See supra.*

summarizes it, and Section Three describes the "study area." Section Four provides background for the planning area, and contains a map showing areas with hydrogeological limitations for selecting landfill sites. *See* Harford County Solid Waste Management Plan, Table 4.9. Most of the County, including the proposed rubble fill site, falls within areas designated as having slight to moderate hydrogeological limitations. The map is a general one, however, and individual sites could be hydrogeologically acceptable even in the areas indicated as severely limited, and vice versa. Section Five concerns public information, and Section Six covers the SWM Plan's present status. The latter section estimates the relative composition of the county's waste.[4] Section Seven describes existing conditions. Section Eight outlines the Plan's objectives, and Section Nine describes future plans, including a table indicating that construction and demolition debris will be disposed of at "Selected sites," instead of buried at the County's landfills. *See* Harford County Solid Waste Management Plan, Tables 9–1, 9–2. A table in Section Nine designated three landfills for construction and demolition debris: these were the Scarboro, Tollgate, and Mullins landfills. *See* Harford County Solid Waste Management Plan, Table 9–2.

The Council updated the Plan in 1976, and it reflected the anticipation that in 1978–79 the County would undertake a study to locate new sites for rubble landfills.

The 1978 Plan estimated that in 1990 the County would require 141 acre-feet[5] of demolition construction rubble landfill space, and noted that it would need new landfill sites.

In 1980, the County updated the Plan and reduced the number of rubble landfill sites without providing replace-

---

4. Construction and demolition waste contribute fourteen percent by weight to the County's solid waste. *See* Harford County Solid Waste Management Plan (1974), Tables 6–24 to 6–26.

5. An acre-foot is a volumetric measurement equal to one acre of land one foot deep.

ment facilities to accept demolition and construction debris. The Secretary of the Department of Health and Hygiene, Charles Buck, objected to this decision in a letter dated July 21, 1980. John Hardwicke was Council president then, and responded to Buck by letter indicating that the County landfills would accept construction and demolition debris unless and until the County decided that it required additional rubble landfill sites. Letter from John Hardwicke to Charles Buck (Aug. 27, 1980). Table 9–1 of the Plan's 1980 version noted that County landfills "and/or Selected sites" would accept construction and demolition debris.

The 1983 update indicated that construction and demolition rubble would be disposed of at "Private approved rubble fills." *See* Harford County Solid Waste Management Plan, 1983 Update, Table 1–1.

In 1985, a private rubble landfill, Spencer's Rubble Fill, was in operation and was expected to continue until 1992. *See id.*, 1985 Update, Table 1–1. Table 1–2 continued to specify that rubble should be disposed in "Private approved rubble fills." The 1985 update also stated that "Harford County has not accepted asbestos or asbestos related materials in the past in any of its landfills and will continue to maintain this position." The Plan required contractors to haul all such materials elsewhere.

By 1988, the Scarboro landfill had expanded and was the County's central landfill. Tollgate landfill closed in July, 1987, and the County's Waste to Energy Plant, which would burn waste and provide steam for the United States Army, was being tested. The Scarboro landfill's expansion and the implementation of the Waste to Energy Plant were the County's long-term solution to the waste disposal problem that had plagued it for years. The 1988 Plan update reiterated the Council's expectation that Spencer's rubble landfill had a maximum life of five to six years. The Plan also projected that private companies would develop rubble landfills, becoming operational in 1988 and 1989, with life expectancies of fifteen years per site. *See id.*, 1988 Update, Ch. 4. The master plan identified no specific sites for

rubble landfills. The Plan reiterated that asbestos would be shipped out of state, and that Harford County had no asbestos disposal facilities available.

The 1988 update contained an action plan calling for extending for thirty years the existing facilities' lives. It also acknowledged that Spencer's rubble landfill would close by 1993, but provided that rubble would continue to be disposed in "private approved rubble fills." [6] *See id.*, 1988 Update, Ch. 5.

The Council also follows its own informal policies and procedures for including rubble landfills in the SWM Plan. For example, the Department of Public Works prepares and amends the Plan, then submits it to the Council for its approval. The Council's policy was to "recycle privately owned sand and gravel pits into rubble landfills" so that the County's valuable landfill space was preserved for domestic waste.[7] The Council also avoided identifying landfill site locations in the Plan, considering proposed locations only when an application was pending before MDE. The Council allowed applicants who filed preliminary MDE permit applications to address the Council in public hearing so that the applicant could avoid unnecessary delay and expense.

The Council also has authority to determine zoning criteria for landfill sites. *See* Md.Envir.Code Ann. § 9–210(a) (1987); Md.Regs.Code tit. 26, § 26.03.03.03(E)(4)f (1988). The Council in 1957 passed a zoning ordinance stipulating that landfills were to be located only in the County's agricultural district. In 1982, the Council adopted comprehensive rezoning, however, allowing landfills in every zoning

---

**6.** The trial court noted that solid waste management planning differs from water distribution or sewage collection planning. Sewage collection planning calls for mapping, but refuse disposal does not: mapping specific future sites is not feasible, and Harford County accordingly has done no more than to map existing disposal facilities. Consequently, the 1988 update features existing facilities and does not show proposed sites.

**7.** The Council believed that using the County's central landfill for rubble disposal would cut the landfill's life in half.

district other than the Office/Research Industrial District. *See* Harford County, Md., Code vol. II, Zoning ch. 267; Table I: Principle Permitted Uses for Specific Zoning Districts—Transportation, Communication and Utilities (1990). Because the County adopted less restrictive new zoning laws after the state implemented its own comprehensive regulatory scheme, the trial court concluded that apparently "the County has placed great reliance on MDE's ability to determine the appropriateness of a particular landfill site." [8]

Significantly, the trial court noted that:

[t]he Council did not require landfills or disposal sites to receive a conditional use or special exception approval. Such treatment appears consistent with the idea that extensive and comprehensive review of each application is the duty of the Maryland Department of Environment. Since this process includes extensive scientific review and public hearing, there was no need to assert zoning control over landfill sites.

## THE TRIAL COURT'S CONCLUSIONS

The trial court found that the Council's November 14 conclusion was correct: the proposed Gravel Hill Road project is consistent with the County's SWM Plan and its subsequent amendments, and the Council could approve that facility subject to various express conditions. The Plan called for private rubble landfill development in the County's southeastern portion. The Council's policy was to target sand and gravel pits as landfill sites because doing so would extend the Scarboro landfill's useful life, and simultaneously reclaim the abandoned mine pits.

The reverse was true with respect to the Council's subsequent decision to rescind its November finding. The trial court opined that:

---

**8.** That sort of reliance may not be appropriate in other counties where the zoning laws may be more restrictive than those of Harford County.

[t]he action represented by Resolution 4–90 was not a finding that the site was inconsistent with the SWM Plan but was a finding that the use of the specific site would represent a threat to ground water resources in the area. This was not a decision relating to interpretation of the Plan, but was rather a specific determination concerning the hydrogeological conditions of the site and area.

The trial court's conclusion on this matter stems from varied evidence, including several council members' depositions indicating their belief that the project was contrary to public interest, and videotapes of the public hearings that ensued after the Council revived the issue. The trial court reviewed portions of the videotapes and described their import:

The focus of the evidence submitted and the statements heard during these public hearings was upon the impact of the rubble landfill at the Gravel Hill site on the neighboring properties.... These subsequent proceedings purported to find that it was not in the best interests of the community, or the County, to have the rubble landfill site located at Gravel Hill. This focus was on the nature of land use type issues and did not address the question of whether the proposed site was consistent with the County Solid Waste Management Plan, as required by statute.

The trial court concluded that however legitimate these concerns, they are not an appropriate basis for the Council's action to rescind its November decision. In the judge's words:

[t]he approval of a rubble landfill site is within the province of the Secretary of the MDE. The regulations ... have been adopted to deal with this process. The statutes do not delegate to the Council the responsibility of determining whether a particular site will adversely affect the water supply of neighboring properties. The Secretary of the MDE has the specific responsibility of conducting public hearings and elaborate investigations to determine the impact of the rubble landfill on ground

water supply.  Neither the Legislature nor the Secretary have delegated that responsibility to the Harford County Council.[9]

\* \* \* \* \* \*

[T]he Council's responsibility was limited to that which was delegated to it in the regulations—to determine whether the site was consistent with the master SWM plan.

## I.  STATE'S LEGISLATIVE PREEMPTION

### A.  The Home Rule Provisions

■ The Council argues on appeal that the Maryland Constitution's home rule provisions control this case.  *See* Md. Const. art. XI–A (means by which counties establish home rule status).  The state constitution requires home rule counties to create legislative bodies vested with the power to create law.  After the adoption of a charter,

the County Council of said County, subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws of said . . . County including the power to repeal or amend local laws of said . . . County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided . . .

---

9.  We pause at this juncture to observe that the statutory scheme does indeed contemplate the possibility of land use review, as a permit may not issue to install or extend the landfill until the landfill meets all zoning and land use requirements of the county where the landfill is to be located.  Md.Envir.Code Ann. § 9–210(a) (1987).  We see nothing in the subject statutes or regulations that would preclude the introduction of scientific evidence concerning the environment, via the zoning process, in those counties where the zoning laws are more restrictive than those of Harford County.  We note, however, that with respect to the case *sub judice* a special exception under the zoning laws was not required, and neither was the type of evidence relevant that attends a special exception hearing.  All that was required was whether the site was consistent with Harford County's solid waste management plan.  See, *e.g., Rockville Fuel v. Board of Appeals,* 257 Md. 183, 262 A.2d 499 (1970).  *Cf. Crowther, Inc. v. Johnson,* 225 Md. 379, 170 A.2d 768 (1960).

*Id.* § 3. The Harford County Council is the county government's legislative branch, as the constitution requires. *See* Harford County, Md. Charter, art. II § 202.

The state's General Assembly grants express powers to counties that adopt a charter form of government, and the General Assembly may not enact local laws on these subjects. Md. Const. art. XI–A, § 2 (requiring legislature to grant express powers); *id.* § 4 (prohibiting state legislature from preempting counties). Harford County is a charter home rule county.

The Maryland Code contains the "Express Powers Act," which defines the charter counties' home rule powers by enumerating the proper subjects for local legislation. *See* Md.Code Ann. art. 25A, § 5 (1987). Article 25A, section 5(T), *inter alia*, authorizes a county council to enact ordinances and amendments relating to waste disposal to protect and promote public safety, health, morals, comfort, and welfare. The article also contains a broad grant of legislative power:

> The foregoing or other enumeration of powers in this article shall not be held to limit the power of the county council, in addition thereto, to pass all ordinances, resolutions or bylaws, *not inconsistent with the provisions of this article or the laws of the State*, as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this article, as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county.[10]

Md.Code Ann. art. 25A, § 5(S) (1987) (emphasis added). *See Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161, 252 A.2d 242 (1969) (section 5(S) is a general welfare clause giving a municipality broad discretion in exercising the police power); 71 Op. Att'y Gen. 197, 199 (1986); *see*

---

10. In other words, charter county police powers are limited to the extent that public general law does not already provide for the particular powers.

*also* Md.Code Ann. art. 25A, § 5(X) (local governments may enact local zoning and planning laws to protect public health and safety).

Each county must have a SWM Plan, and its contents are to include:

(1) [provision] for the orderly expansion and extension of ... systems in a manner consistent with all county and local comprehensive plans prepared under [*inter alia* Article 25A § 5(X)] of the Code ...

Md.Envir.Code Ann. § 9–505(a)(1) (1988).

The Council argues that its authority to enact legislation deleting a proposed rubble fill site from the County's SWM Plan is independent of any authority granted to the Council by the legislature pursuant to the Maryland Environmental Article. Citing the state constitution's home rule provisions, the Council argues that municipalities are empowered to govern themselves in local matters without state interference, and that this includes regulating solid waste management, engaging in planning and zoning for the public welfare, and the county's police power.

Whereas the county possesses a large measure of power through the state constitution's home rule provisions, its power is limited in those areas preempted either by the constitution, or by conflicting provisions of state law. Md. Code Ann. art. 25A, § 5(S); *see also* 71 Op. Att'y Gen. 197, 200 (1986) ("authority flowing from the Express Powers Act is not unlimited"). We turn, then to consider whether the County's actions were preempted.

### B. State Preemption

#### 1. Landfill Site Approval

The Council initially concluded that MRA's proposal was consistent with Harford County's SWM Plan. The trial court found this permissible, and we agree: the SWM Plan called for privately developed rubble landfills to be located in the county's southeastern portion and to utilize abandoned sand and gravel pits, if possible.

The lower court also found that Resolution 4–90 was not a Council decision as to the proposed site's inconsistency with the Plan. Rather, the Council decided that the site's hydrogeological conditions make it unsuitable for use as a rubble landfill, because it might threaten the area's ground water. The Council also deliberated upon the incompatibility of the rubble fill with surrounding land uses, a classical exercise usually undertaken in zoning matters. The trial court concluded that the Council's action in passing Resolution 4–90, however well motivated, exceeded its authority, and we concur.

The trial court found that MDE, and not the County, is responsible for approving landfill sites via the permit process. The regulations require MDE to conduct public hearings and undertake elaborate investigations to determine how a landfill will affect the area's ground water, and neither the state legislature nor MDE have delegated that responsibility to the Harford County Council. As the trial court put it, "the Council's responsibility was limited to that which was delegated to it in the regulations—to determine whether the site was consistent with the master SWM plan. The Council also has the responsibility to make determinations as to what types of material can be located in the rubble landfill...." Thus, the trial court found that because the Council enacted Resolution 4–90, which eliminated the site from the County's SWM Plan out of its concern for the site's effect on local ground water and/or its compatibility with surrounding land use, and not on the basis of its consistency with the Plan, it impermissibly exceeded its authority.[11]

The trial court's finding raises issues concerning whether state law, which oversees solid waste management planning and permitting processes, preempts local law. Although a

11. We point out that even if the proposal is consistent with the County's Plan, this does not mean that MDE will issue a permit for the project: MDE engages in extensive testing on the very issues that concern the Council, and it may decline to issue the permit.

charter county's laws ordinarily would prevail over state law in subjects that are local in nature, the state's legislation may preempt a field of regulation in certain areas. *See* O. Reynolds, *Local Government Law* § 43 (1982) ("state may by legislation have pre-empted (or "occupied") a particular field of activity or regulation."). The Court of Appeals stated the doctrine as follows:

> [P]re-emption is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field. Pre-emption may be accomplished either expressly by statutory language prohibiting local legislation, .... or impliedly, by other unequivocal conduct of the General Assembly.... In either case, the focus of the inquiry must be on whether the General Assembly has manifested a purpose to occupy exclusively a particular field.

*Ad + Soil, Inc. v. County Comm'rs*, 307 Md. 307, 324, 513 A.2d 893 (1986) (appellate court upheld zoning board denial of conditional use permit to sewage sludge storage and distribution facility).

A county has only such powers as the state expressly grants, as well as those that are fairly implied from those expressly granted. By virtue of the Express Powers Act, counties have full power to enact local laws on the Act's enumerated subjects. *Murray v. Director of Planning*, 217 Md. 381, 387, 143 A.2d 85 (1958) (local zoning act did not conflict with Home Rule Amendment). Nevertheless, counties are subject to the legislature's control, and where legislation conflicts with local law, the state law prevails.

> [A county] is not invested with any of the attributes of sovereignty, but it is a constituent part of the state government—a wholly subordinate political division or instrumentality, created and existing with a view to the policy of the state at large and serving as an agency of

the state for certain specified purposes. The legislature has the same power over counties and county officers that it possesses over state officers.

56 Am.Jur.2d *Municipal Corporations* § 17 (1971) (citations omitted).

■ A county ordinance must not conflict with state general laws on matters of statewide concern, but it may enact ordinances that are not expressly authorized by state law. *See* Md. Const. art. XI–A, § 3; *Levering v. Park Comm'rs*, 134 Md. 48, 53, 106 A. 176 (1919) (conflicting ordinances are invalid); *see also Rossberg v. State*, 111 Md. 394, 74 A. 581 (1909) (ordinance enacted pursuant to express authority is generally held valid, although state statutes cover the same subject); *County Council v. Montgomery Ass'n*, 274 Md. 52, 59 n. 4, 333 A.2d 596 (1975) (collecting cases using *Rossberg's* concurrent powers theory). Health and sanitation inherently are matters of statewide concern, as manifested by the legislature's history of relevant statutory and regulatory enactments.

### 2. Express Preemption

In the case before us, Resolution 4–90 does not *expressly* conflict with state law. It may be that the state legislature intended to reserve to itself the exclusive right to legislate on the entire subject, but if that were its intent, it is not apparent from the statutory language.[12]

The state's presence in this regulatory field could amount to implied preemption on the theory of occupation, however, and it is to this that we devote the remainder of our preemption analysis.

### 3. Implied Preemption

Determining whether state legislation impliedly preempts local enactments is a difficult task, and involves assessing whether state regulations have so thoroughly and perva-

---

**12.** The relevant legislative history, such as exists, likewise is silent on the legislature's intent in this matter.

sively covered the subject as to completely occupy the field, and whether the subject requires uniform state-wide treatment. *See* O. Reynolds, *supra; see also* 3 A. Rathkopf & D. Rathkopf, *The Law of Zoning and Planning* § 31.02 (1991) ("When determining this 'implied preemption' issue, whether the state has acted in a comprehensive manner or whether there is a need for uniformity with respect to a matter of statewide concern are important factors considered by courts.").

In *Baltimore v. Sitnick & Firey*, 254 Md. 303, 311, 323, 255 A.2d 376 (1969), the Court of Appeals examined this ground on which otherwise valid local laws are invalidated because state legislation is so forceful that its occupation of the field must be implied. This case involved a conflict between city minimum wage ordinances and similar state provisions in which the Court acknowledged the city's authority to establish minimum wage regulations. The Court wrote that "[t]he question is, to what extent was that authority circumscribed, restricted or abrogated by the action of the State moving into this field of legislation and establishing a comprehensive scheme of statewide regulations." *Id.* at 310, 255 A.2d 376. The Court articulated the test as the "legislature so forcibly express[ing] its intent to occupy a specific field of regulation that the acceptance of the doctrine of pre-emption by occupation is compelled. . . ." *Id.* at 323, 255 A.2d 376.

Later, in *Ad + Soil v. County Commissioners*, the Court of Appeals again addressed implied preemption in a scenario superficially similar to the one at bar. *Ad + Soil*, 307 Md. 307, 513 A.2d 893 (1986). Because the two cases involve substantially the same state laws, and because the Council urges it as authority for its argument that state law does not preempt local law on this issue, *Ad + Soil* warrants closer examination. From the outset, however, we must keep in mind that *Ad + Soil* is a zoning case, and thus is inherently different from the one at bar. It is inapposite because, *inter alia,* the legislature in carving out its niche in the subject field of solid waste management

specifically subjected the permit process to local zoning and land use controls. Harford County's zoning requirements regarding landfills are of neutral effect in the case *sub judice.*

Ad + Soil owned a sewage sludge and distribution facility in Queen Anne's county. The plant was located in an area designated 'A–1' Agricultural in the county zoning ordinance. Ad + Soil had obtained from the state the necessary permit to operate the facility, but the facility violated the county's zoning ordinance. The Zoning Administrator advised Ad + Soil that its facility would be acceptable in a 'B–2' General Business District.

Ad + Soil obtained a new site in an area designated 'M–2' General Industrial District: any use permitted in a 'B–2' district is also permitted in an 'M–2' district. Ad + Soil intended to use the site to effect sludge transfers and to build a sludge storage facility. The Zoning Administrator informed Ad + Soil that it would have to obtain a zoning permit and a release from an existing conditional use decision affecting the site.

Ad + Soil acquired the necessary state permits for the new facility, and immediately began operation. It did not apply for county zoning approval. The Zoning Administrator ordered Ad + Soil to cease all activities pending its acquisition of the zoning permit and the release. Ad + Soil applied for these while remaining in full operation. The Zoning Administrator subsequently notified Ad + Soil that recent amendments to the county zoning ordinance made sewage sludge storage and distribution a conditional use in that district: Ad + Soil would have to obtain a conditional use permit from the county Board of Appeals. The Zoning Administrator also directed Ad + Soil to apply for this authorization or stop all its activity within fifteen days. Ad + Soil ignored this deadline, and in the meantime intensified its activities at the site.

Ad + Soil applied for the conditional use permit required by the amended zoning ordinance. Twice the Board of

Appeals unanimously denied these applications on the grounds that it could grant variances only under extraordinary circumstances, and only if granting the variance would not be detrimental to adjacent property. The Board also denied Ad + Soil a conditional use permit because the permit depended upon Ad + Soil's obtaining the variances, but the Board noted that had it considered the merits of the conditional use application, it would have denied the permit in any case.

The Circuit Court considered Ad + Soil's claim that state law conflicted with or preempted the county's zoning ordinance as applied to sewage sludge facilities and concluded that there was no preemption and no conflict. Ad + Soil appealed this decision, and the Court of Appeals granted certiorari before this court considered the case. We address here that portion of the Court of Appeals' decision concerning implied preemption in which it affirmed the Circuit Court's decision.

The Court of Appeals stated that "[w]hen properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field.... [T]he focus of inquiry must be on whether the General Assembly has manifested a purpose to occupy exclusively a particular field." *Ad + Soil*, 307 Md. at 324, 513 A.2d 893 (citations omitted). It reasoned that:

[a]lthough the General Assembly has enacted extensive statewide legislation in the field of sewage management, the legislation manifests a general policy of fostering local control under state supervision, rather than to totally prohibit the enactment of laws on the subject at the local level. Title 9 of the Health Environmental Article, which contains the bulk of the state law governing sewage management, is replete with references to the concurrent legislative authority of local jurisdictions. Each county is required to adopt a comprehensive plan for sewage management, to be submitted for the review and approval of the Department of Health and Mental Hygiene.... Such a plan must be consistent with all local

zoning regulations, and must provide the Department with adequate information regarding such regulations ... Section 9–502(c) states that "[a]ny rule or regulation [of the Department] adopted under this subtitle does not limit or supersede any other county, municipal, or State law, rule, or regulation that provides greater protection to the public health, safety, or welfare."
*Id.* at 327, 513 A.2d 893.

The Court continued with an analysis similar to the one outlined *infra*, pointing to what then was title 9 of the Health Environmental Article, and noting that it is "replete with references to the concurrent legislative authority of local jurisdictions." *Id.* at 326–27, 513 A.2d 893. Because so much of the statutory scheme governing sewage treatment and landfills is identical, we now compare the relevant laws.

■ Counties must adopt a comprehensive sewage management plan to submit for state review and approval. *Id.* at 327, 513 A.2d 893. These provisions apply also to solid waste management. *See* Md.Envir.Code Ann. § 9–503 (1987). The sewage management plan must be consistent with county zoning regulations. *Ad + Soil*, 307 Md. at 327, 513 A.2d 893. And "[a]ny rule or regulation [of the Department] adopted under this subtitle does not limit or supersede any other county ... regulation that provides *greater protection* to the public." *Id.* at 327, 513 A.2d 893 (emphasis added) (citing Md.Health–Envtl.Code Ann. § 9–502(c), *recodified* at Md.Envir.Code Ann. § 9–502 (1987)).[13]

---

**13.** The 1988 amendment to section 9–210 by implication modifies the limit of the local provision. *See* Md.Envir.Code Ann. § 9–210 (Supp. 1991); *see also* discussion *supra* (change in section's language demonstrates legislature's intent to limit county control over issuing landfill permits). Section 9–502(c) does not operate to allow a county to veto state law. Nevertheless, its terms are logically harmonious with a scheme that allocates separate domains to each government entity: the state to regulate the permit issuing process including the scientific environmental aspect of landfill operation, and the county to regulate other aspects such as planning and zoning. A Pennsylvania sanitary landfill case addressed a similar situation as follows:

Notwithstanding the fact that these provisions apply to sewage regulation and to solid waste management, the case at bar is distinguishable from *Ad + Soil* on several counts. Most significantly, counties arguably have more autonomy in regulating sewage as compared with regulating solid waste management. The court in *Ad + Soil* stated that the "Department may not issue a permit for a sewage sludge composting facility unless the facility complies with all applicable county zoning and land use requirements and is *not opposed by the local legislative body.*" *Ad + Soil*, 307 Md. at 327, 513 A.2d 893 (emphasis supplied).[14] First, the proposed landfill is consistent with Harford County's zoning laws. As noted, *supra*, the relevant Harford County zoning laws are extremely broad, while the Queen Anne's county laws pertaining to sewage sludge were not. Second, although a landfill provision once existed similar to the sewerage provision requiring a written statement from the

[A] local municipality cannot set geological or engineering standards stricter than those established by DER for issuance of its permit. However, factors other than geological ones, such as those involving aesthetics, population density, and accessibility govern the selection of a landfill site, and these factors are the appropriate subject of local land use planning.

*Greene Township v. Kuhl*, 32 Pa.Cmwlth. 592, 379 A.2d 1383, 1385 (Commw.Ct.Pa.1977). Here, the landfill site is in compliance with the local zoning laws. *Compare Chester Township v. Department of Envtl. Protection*, 181 N.J.Super. 445, 438 A.2d 334 (1981). In *Chester*, the state legislature had repealed any possible local "veto" with respect to more stringent regulations. The local zoning ordinance required landfill site plan approval and an environmental impact statement, and the township argued that these were "interstitial" interests, within its jurisdiction, and not preempted by state law. *Id.* 438 A.2d at 338. The court rejected this argument, saying that "the State has preempted this particular area from municipal regulation." The court noted that even though the State has preempted the field, it may not disregard conflicting local zoning ordinances because the Solid Waste Management Act provided for local participation in these decisions. The State met this provision of the Act, however, by considering the township's interests as manifested by, *inter alia*, receipt of public comment via public hearings, meetings with township representatives, and adjusting the plans accordingly.

**14.** When the legislature revised the Health–General Article, this section became Md.Envir.Code Ann. § 9–233.

county governing body indicating that it does not oppose the state's issuance of a sewage sludge permit, that provision was repealed in 1988. *See* Md.Envir.Code Ann. § 9–210, *supra,* and discussion, *infra.*

The *Ad + Soil* opinion also pointed to sections 9–601 through 9–699 and 9–901 through 9–958, but these are not relevant to the case at bar, in the first instance because the subtitle does not apply to Harford County, and in the second because the subtitle concerns water and sewer authorities and is irrelevant to solid waste management. *See* Md.Envir.Code Ann. § 9–602(3) (1987) (subtitle does not apply to Harford County); *id.* subtitle 9 (water and sewer authorities). The remainder of the legislation cited by the court similarly is focused on sewage regulation and not upon solid waste management. *Ad + Soil,* 307 Md. at 327, 513 A.2d 893; *see also* Md.Envir.Code Ann. § 9, subtit. 7, Part III (1987) (Assessments, Rates, and Charges by Political Subdivisions for Water and Sewerage Service); *id.* subtit. 8 (Sewerage Facilities Bond Act); *id.* subtit. 9 (Water and Sewer Authorities). Although the Code devotes considerable space to sewage regulation, the court nevertheless concluded that:

> [t]hese statutory provisions manifest a general legislative purpose not to prohibit local legislation, but rather to coordinate and supplement such legislation through the enactment of a statewide regulatory panoply. Indeed, this body of state law clearly contemplates a pervasive and vital role for local legislation in the field of sewage management.

*Ad + Soil,* 307 Md. at 328, 513 A.2d 893.

We already have reviewed the statutes applying to solid waste management at some length, but detail here the provisions that underscore the legislature's general intent to reserve to MDE the specific subject matter governing the decision to issue permits to solid waste management facilities, and to relegate to counties a restricted role in planning.

### a.   The Plan

■ The relevant definitions section indicates that a " 'proposed' county plan" means a plan that the county's governing body has adopted but which MDE has not approved, including any proposed amendment or revision. Md.Envir.Code Ann. § 9–501(k) (1987).   We believe that county plans, even at the stage at which they have been adopted and subsequently undergo revision, are not final and operational until the state's agency signifies its approval.   The revisor's note supports this, stating that "a county plan is only "proposed" by a county governing body before the county plan is approved by the Department."   1983 Md.Laws, ch. 542.

The state's role in finalizing county plans is further apparent in a section that requires counties to have their plans approved by the MDE.   *See* Md.Envir.Code Ann. § 9–503 (1987).   The revisor's note supports this interpretation, indicating that "[e]ven though each county governing body adopts its own county plan, the Department, in practice, also must approve the plan for it to be effective."   A county must have a plan, and the MDE has final approval authority over that plan.

Our examination of the statute reveals that the county's role in developing a SWM Plan is limited, and closely supervised by MDE.   It requires a county's governing body to review the plan at least every two years "in accordance with a schedule set by the Department."   *Id.* § 9–503(b); *see also id.* § 9–506(b) & (c) (requiring counties to submit to MDE progress reports on plan development, and bi-annual review reports, and providing sanctions for counties failing to submit reports).   Counties may initiate plan revision, but MDE *sua sponte* may require a county to revise or amend its plan.   *Id.* § 9–503(c).   Moreover, the statute specifies extensive notice and hearing requirements that a county must meet before adopting revisions or amendments to its plan.   *Id.* at (d).

Regulations as to a plan's contents are similarly detailed. A county must incorporate existing subsidiary county plans. *See id.* § 9–504. Another section describes the plan's contents. *Id.* § 9–505.

MDE may reject a county's proposed plan or plan revisions, or it may "[m]odify or take other appropriate action on the proposal." *Id.* § 9–507(a). Any action MDE takes is predicated upon its solicitation of technical advice concerning the proposal from the Department of Natural Resources, the Department of State Planning, and the Department of Agriculture. *See id.* § 9–507(b). While MDE approval is pending, the county may use its plan, but it does so at its own risk. *See id.* § 9–507(e)(1). Furthermore, "[a]fter the county governing body adopts the proposed county plan, a person shall follow the provisions of that plan *except to the extent that the Department modifies or disapproves that plan." Id.* § 9–507(e)(2) (emphasis added). A county may ask MDE to reconsider its decision, but it must do so according to MDE's regulations. In toto, these provisions indicate MDE's strong control over county plans, including its ability to modify or veto plans or amendments of which it does not approve. *See also id.* § 9–510 (empowering MDE to conduct surveys and research, and other miscellaneous powers).

#### b. The Permit

MDE's authority in regulating solid waste management extends to the entity proposing a refuse disposal system for public use. A person [15] installing, altering, or extending such a facility must first obtain a permit from the MDE. *See id.* § 9–204. MDE may not issue the permit until the applicant supplies a written statement indicating that the proposed system conforms to the county plan, and meets zoning and land use requirements. *See id.* § 9–210(a).

---

**15.** The subtitle defines "person" to include governmental subdivisions such as counties. Md.Envir.Code Ann. § 9–201(c) (1987).

MDE has authority for approving permit renewals. *See id.* § 9–213.

A county's power in the statutory scheme pertaining to issuing permits is minimal. MDE may not issue a rubble landfill permit unless the county has specified in its SWM Plan the types of waste that may be disposed of at that site. But the county's options are constrained by the brief list provided in the statute. *See id.* § 9–210.

The Code of Maryland Regulations adds detail to the framework supplied by the statute. *See* Md.Regs. tit. 26, subtit. 04, ch. 07 (1988) (solid waste management). These provisions exhaustively specify the supporting technical material an applicant must submit, and the procedures MDE must follow upon their receipt, including extensive review of the proposal's technical aspects. MDE may at any phase refuse to grant the permit. *See id.* § 26.04.07.06(C)(4)(b) (1988) (MDE must deny an application if it determines the site is unsuitable for its intended use); *id.* § 26.04.07.-07(D)(4) (at Phase II, MDE shall either deny the permit, or determine whether the application may proceed); *id.* § 26.-04.07.08(D)(2) (at Phase III, MDE either shall deny the permit, or proceed with a public hearing or necessary revisions).

Although counties do not directly participate in the permitting process, a county has many opportunities to comment upon a proposal's merit. At each phase of the permitting process, MDE distributes to the county's governing body and its local health official a copy of the most recent applicant's report, and solicits their comments on the proposal. *See id.* § 26.04.07.06(C)(1) & (2) (1988) (Phase I); *id.* § 26.04.07.08(D)(1) & (2) (Phase II); *id.* § 26.04.07.08(D)(1) (Phase III). Also, before issuing a permit, MDE must hold a public hearing, during which the county has a final opportunity to offer evidence and present arguments for or against the proposed facility. *See id.* § 26.04.07.09, pursuant to Md.Envir.Code Ann. § 9–209 (1987). Any other interested parties may at this time comment upon the proposal.

Whether to issue the permit is solely MDE's decision, however.

One aspect of the statute's legislative history deserves further mention here. The trial court noted that section 9–210 at one time gave counties broader power with respect to issuing permits for proposed landfills. Before the section was repealed and replaced with the current section (a) on July 1, 1988, MDE could not issue a permit without the Council's approval.[16] This change is significant because it reflects the legislature's intent to remove any suggestion that a county exerts control in the process of issuing landfill permits.[17] Documents from MDE concerning the proposed changes in the legislation support this interpretation. *See* MDE Legislative Proposal # 3 (1988). Under the section explicating the bill's justification, MDE noted that:

> [t]he requirement that a written statement be provided that the county does not oppose the facility has been ruled in two counties (Baltimore County and Anne Arundel County) to be *beyond the authority given to the county* and is, therefore, of no effect and is being repealed.

*Id.* (emphasis supplied). In any event, reason and logic dictate that the change in the language clarifies the General Assembly's intent to define roles of county participation in this process. *See Lomax v. Comptroller*, 323 Md. 419, 424, 593 A.2d 1099 (1991) (where a statute is susceptible of more than one meaning, " 'the court ... may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with com-

---

**16.** "The Secretary may not issue a permit ... until ... [t]he Department has a written statement that the board of county commissioners or the county council of the county where the landfill is to be located does not oppose the issuance of the permit." H.B. 448, 1988.

**17.** There is, of course, some limited but indirect control through the local government's zoning and land use requirements, § 9–210(a).

mon sense.' ") (*quoting Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987)).

### c. Partial Preemption

Even if state law did not suggest the legislature's general purpose to reserve entirely this regulatory power to the expertise of state agencies, state legislation may *partially* preempt the field. In this context, much depends upon the meaning of the word "field." [18] That is, a field could be defined inclusively to encompass everything under that heading (*i.e.* "Solid Waste Management" includes all aspects of management, from cradle to grave), or it could be defined to mean precise subfields under the broader heading (*i.e.* "Solid Waste Management" defined as a series of

---

18. Courts here and elsewhere use a variety of terms in referring to "field." Some opinions, *Ad + Soil* among them, suggest exclusivity by using words such as "entire," and "wholly;" others do not use language suggesting exclusivity, but the cases in which they arise do not involve situations in which circumstances lent themselves to partial preemption; still others suggest partial preemption without complete occupation of the field. *See McCarthy v. Board of Educ.,* 280 Md. 634, 651, 374 A.2d 1135 (1977) (no language of exclusivity); *County Council v. Montgomery Ass'n,* 274 Md. 52, 59, 333 A.2d 596 (1975) ("entire" field); *Sitnick,* 254 Md. at 323, 255 A.2d 376 ("specific field of regulation"); *National Asphalt v. County,* 292 Md. 75, 78, 437 A.2d 651 (1981) (state legislation "embraced virtually the entire area involved"); *see also Union Nat'l Bank and Trust Co. v. Board of Supervisors,* 65 Ill.App.3d 1004, 22 Ill.Dec. 627, 382 N.E.2d 1382 (1978) (state's comprehensive regulatory scheme implied the counties should have no power to regulate); *People v. Commons,* 64 Cal.App.2d Supp. 925, 148 P.2d 724 (1944) (full occupation); *Merced Dredging Co. v. Merced County,* 67 F.Supp. 598 (S.D.Cal.1946) (state remedies afford all necessary relief); *Milton v. Attorney Gen.,* 372 Mass. 694, 696, 363 N.E.2d 679 (1977) ("clear intention to preempt the matter as an area of complete State concern"); *Overlook Terrace Management v. West New York Rent Control Bd.,* 71 N.J. 451, 461–62, 366 A.2d 321 (1976) (no language of exclusivity); *Albany Builders Ass'n v. Guilderland,* 74 N.Y.2d 372, 547 N.Y.S.2d 627, 546 N.E.2d 920 (1989) (state preempted field of highway funding, occupying the "entire" field).

Although *Ad + Soil'*s language suggests that implied preemption entails exclusive state occupation of the entire regulated field, that decision neither discussed nor precluded the concept of partial preemption. *See* O. Reynolds, *supra,* at 121 ("Since pre-emption is not readily to be inferred, the courts proceed with caution here and sometimes find a partial, or "selective," pre-emption.").

smaller fields, one of which might be local planning, another of which being state-issued permits). Reynolds adverts to this in referring to "selective pre-emption," and cites cases that address state gambling regulations. *See* Reynolds, *supra,* at 121; *In re Hubbard,* 62 Cal.2d 119, 41 Cal.Rptr. 393, 396 P.2d 809 (1964) (ordinance prohibiting operating game of chance did not conflict with general laws that did not mention certain forms of gaming in regulating gambling) (*disapproved* on other grounds, *Bishop v. City of San Jose,* 1 Cal.3d 56, 81 Cal.Rptr. 465, 469, 460 P.2d 137, 141 (1969)); *DeLong v. Downes,* 175 Mont. 152, 573 P.2d 160 (1977) (legislature preempted field to extent of authorizing certain forms of gambling) (*rev'd* in part, on other grounds), *Tipcon v. City of Billings,* 197 Mont. 339, 642 P.2d 1074, 1077 (1982); *Cossack v. City of Los Angeles,* 11 Cal.3d 726, 114 Cal.Rptr. 460, 523 P.2d 260 (1974) (state preempted regulation of games of chance, but not games of skill). *In re Hubbard* suggests that articulating what constitutes the "field" is key.

> In order to determine this question the 'field' involved should first be defined.... [T]he general law consists of a series of prohibitory enactments covering many aspects of gambling. Do those many statutes constitute a full occupation of the entire subject matter of gambling, in its varied forms? Or is the 'field' which we are asked to find preempted by the state limited to the subject of 'gaming'....

*Hubbard,* 396 P.2d at 813. The court concluded that state regulations only partially preempted the field.

The gambling cases are instructive in our attempt to define the term "field." *Hubbard* involved an attack on a local ordinance prohibiting a game of chance on the ground that state legislation, which did not expressly prohibit this particular game, had preempted the field of gambling. *Id.* at 810.

> [T]he general law consists of a series of prohibitory enactments covering many aspects of gambling. Do those many statutes constitute a full occupation of the

entire subject matter of gambling, in its varied forms? Or is the "field" which we are asked to find preempted by the state limited to the subject of "gaming"; ... A third possibility is that the field should be defined in such a manner as to be limited to participation in "banking or percentage" games.

*Id.* at 813. The court concluded that the legislature did not intend to occupy the entire field of gambling. *Id.* If the legislature wanted to regulate the entire field of gambling for money, it could have said so. *Id.*

In *Cossack*, the court found that state legislation preempted a local ordinance pertaining to games of chance, but not to games of skill because the legislation *specifically excluded* them from its purview. *Cossack v. City of Los Angeles*, 523 P.2d 260, 263–64 (1974).

In *DeLong v. Downes*, state legislation expressly authorized various forms of gambling. *DeLong*, 573 P.2d 160, 162. These statutes delegate to municipalities the limited power to regulate licensing of gambling, but "reveal no language empowering the local units to prohibit 'authorized' forms of gambling in their entireties. Neither is such prohibition properly implied from an exercise of licensing power. Thus, neither [municipality] has the power or jurisdiction to limit or altogether prohibit certain forms of gambling within its jurisdiction by way of ordinance or resolution." *Id.* "In effect, the legislature has preempted the field with regard to authorization of certain forms of gambling and card games." *Id.*

One thread running through all three cases is that the state legislature may take a broad category, such as gambling, and legislatively preempt a segment or portion of that category, leaving other portions open for local control. *Hubbard* suggests that if the legislature intended to occupy the broader category, it could have expressed this in the statute. Likewise, the Maryland statutes governing solid waste management divide the regulatory scheme into segments pertaining to issuing permits and to planning, and whereas the planning segment assigns to counties a dis-

tinct, albeit state-supervised role, the permit-issuing segment reserves power to the state's agency, MDE.

Moreover, if the term "field" were defined to give counties the authority to control the permit-issuing process, county governments, ever sensitive to the pressures of their constituents, might shy away from approving necessary projects. The important governmental function of providing responsible solid waste management cannot be abandoned to the vicissitudes. of the local political scene by an over-broad interpretation of what constitutes a regulatory field.

In summary, we hold that the legislature intended to occupy the field of landfill regulation in a manner that limits a county's role to identifying the type of waste that may be disposed of in a rubble landfill, determining whether a proposed site is consistent with its SWM plan, and in determining whether a site meets "all applicable zoning and land use requirements." We observe, as did the trial court, that the Harford County zoning and land use requirements allowed the proposed fill as a permitted use without special exception approval. When the Harford County Council enacted Resolution 4–90, it obviously did so because of a feared threat to ground water resources in the area and because of considerations related to land use compatibility. It was not a determination that the site was inconsistent with the Harford County solid waste management plan. Under the statutory scheme, as it exists between the state and Harford County, the "specific determination concerning the hydrogeological conditions of the site and the area" was an impermissible invasion on the state's permit review prerogative.

Because of our holding as to the first issue, we need not address the question of whether the Council acted in its legislative capacity and not adjudicatively, nor need we address the Council's argument that the procedures it followed in enacting Resolution 4–90 were proper.

**158**

JUDGMENT AFFIRMED; COSTS TO BE PAID BY AP-
PELLANTS.